[No. 34579-6-I.    Division One.    January 21, 1997.]

*In the Matter of the Marriage of* CAROLE A. HARRINGTON, *Appellant,* and DENNIS L. HARRINGTON, *Respondent.*

*Malcolm L. Edwards* and *Edwards, Sieh, Hathaway, Smith & Goodfriend,* for appellant.

*Kenneth E. Brewe;* and *Douglass A. North, Douglas W. Ahrens,* and *Maltman, Reed, North, Ahrens & Malnati, P.S.,* for respondent.

KENNEDY, A.C.J. — Carole Harrington appeals the trial court's findings of fact, conclusions of law, and decree of dissolution of marriage entered on February 17, 1994, contending that the trial court erred: (1) in failing to include and value as part of the community assets the Harringtons' vested right to acquire additional stock in Harrington Chevrolet at a price well below market value; (2) in fixing the interest rate on the equalization award at seven percent per annum; and (3) in determining that it was just and equitable to divide the community property equally. Ms. Harrington also requests an award of attorney fees and costs on appeal under RAP 18.1 and RCW 26.09.140. Because the trial court erred in failing to include and value the vested right to acquire the additional stock at a price well below market value, and because the trial court failed to state its reasons for awarding only seven percent per annum on the equalization award, we reverse and remand for further proceedings consistent with this opinion, but we affirm the trial court's determination that an equal division of the community property was fair and equitable in all the circumstances.

Mr. Harrington cross-appeals, contending that the trial court erred in granting Ms. Harrington's motion for reconsideration, thereby eliminating the minority ownership discount which the trial court initially used to calculate the value of the parties' stock in Harrington Chevrolet. We affirm the trial court's grant of the motion for reconsideration.

## FACTS

Carole and Dennis Harrington were married on January 29, 1972, and separated in May of 1992. Because the Harringtons' two children had reached the age of major-

ity, the primary issue at trial was the valuation and distribution of the parties' assets.

At the time of trial, Ms. Harrington was 50 years of age. Aside from the need for major dental work, Ms. Harrington was in good health. She received a Bachelor of Arts degree in sociology from the University of Washington in 1967. After graduating from college, Ms. Harrington held a variety of jobs including working as a flight attendant, selling hotel meeting spaces, and developing and marketing a telephone follow-up program for automobile dealers. In 1978, the Harringtons moved from California to Washington where they purchased Poier Motors in Snohomish. Ms. Harrington worked at the dealership for an unspecified period of time, as well as briefly in retail sales. In 1989, she started a flower arrangement business which she continued to operate at the time of trial. Although the business consistently operated at a loss, Ms. Harrington and her vocational counselor projected financial success.

Ms. Harrington held two assets characterized by the court as her separate property. The first was a one-third interest in a testamentary trust established by her father which was funded with $600,000 of assets. Ms. Harrington has no direct control over the disbursement of the trust funds, nor are the funds liquid. The court valued Ms. Harrington's interest in the trust at $200,000. The second asset was Ms. Harrington's interest in her deceased father's car dealership, Glen Grant Chevrolet, which the court valued at $75,000. Between 1989 and 1991, Ms. Harrington received a total of approximately $17,500 in interest income from Glen Grant Chevrolet.

Ms. Harrington's financial declaration listed her monthly expenses for ordinary household items at $4,911.63, which included mortgage payments on the family home. In addition, Ms. Harrington had incurred substantial indebtedness for dental work, attorney fees, counseling, taxes, and home maintenance and repairs. Based on all of the above, the trial court found that, at the time of trial, Ms. Harrington had no significant earning

capacity, and that her need for income would continue for the foreseeable future.

At the time of trial, Mr. Harrington was 48 years of age and in good health. He attended the University of California at Berkeley for approximately four years, but did not receive a degree. After serving three tours of duty with the Navy as a fighter pilot, Mr. Harrington held various jobs. He worked in his father's machine shop, sold small airplanes, and eventually worked with Ms. Harrington in her telephone follow-up program. When the Harringtons moved to Washington and purchased Poier Motors, Mr. Harrington began working full-time as manager of the business. He continued in that capacity when the Harringtons acquired the Pignataro Chevrolet dealership in Everett, renaming it Harrington Chevrolet. At the time of trial, Mr. Harrington's monthly base salary at Harrington Chevrolet was $6,600.

While acting as manager of Harrington Chevrolet, Mr. Harrington developed two software programs called "Fontminder" and "FontFiddler." He subsequently entered into a distribution and license agreement with a California company, under which he receives 12 percent of the net sales income generated by the software. Mr. Harrington also acts as a consultant to an advertising firm used by Harrington Chevrolet, earning $1,000 a month for his consulting services. Finally, Mr. Harrington earns "prize points" from Chevrolet which average about $800 a month. Based on all of the above, the trial court calculated Mr. Harrington's gross monthly income at approximately $12,300.

The primary asset held by the Harringtons during their marriage was their interest in Harrington Chevrolet. Harrington Chevrolet is a corporation with three classes of stock: preferred stock, class A common stock, and class B common stock. The Harringtons held a small percentage of the preferred stock, and all of the class B common stock. The remainder of the preferred stock and all of the class A common stock were held by Motors Holding Corporation,

a subsidiary of General Motors created to assist prospective dealers in the acquisition of General Motors dealerships.

The preferred stock had a par value of $100 and earned dividends of $6 per share annually. Harrington Chevrolet was permitted to defer payment of dividends, and in fact had never paid dividends as of the date of trial. Unpaid dividends were added to the value of the shares at the end of each year. The last valuation before trial indicated that the book value of the preferred stock with the accumulated dividends was $141.95 per share. Although class A and class B common stock were treated equally financially, each having a par value of $100 per share, class A common stock had 75 percent of the voting rights while class B common stock had only 25 percent. Thus, through its ownership of class A common stock, Motors Holding Corporation controlled Harrington Chevrolet.

Harrington Chevrolet was organized under what Motors Holding Corporation referred to as the "old plan." Under the old plan, the Harringtons had the right to retire Motors Holding Corporation's interest in Harrington Chevrolet by purchasing its stock directly, or by causing the corporation to redeem Motors Holding Corporation's shares. The old plan provided that the purchase, whether directly by the Harringtons or indirectly through the corporation, was to be at book value. At the time of trial, the book value of Motors Holding Corporation's class A common stock was $177 per share, while the book value of the preferred stock was $141.95 per share.

Just before the parties' separation in 1992, Motors Holding Corporation developed a "new plan." The new plan was more advantageous to the Harringtons because, rather than requiring them to pay book value for Motors Holding's class A shares, it permitted them to acquire the shares at their par value of $100 per share. As under the old plan, the preferred stock would be acquired at book value, most likely through refinancing of Harrington Chevrolet's real estate. Mr. Harrington testified that al-

though the preferred stock could be acquired with any funds available to the Harringtons or Harrington Chevrolet, the new plan required that the class A shares be acquired with corporate profits, if structured as a stock redemption, or with Mr. Harrington's bonus income, if structured as a direct purchase.[1]

Before trial, under strong pressure from Motors Holding Corporation, and because implementation of the new plan would be beneficial to him, Mr. Harrington initiated the process to convert to the new plan by obtaining tentative approval from U.S. Bank to refinance the car dealership's real estate. The process was halted, however, when Ms. Harrington obtained a temporary restraining order preventing Mr. Harrington from refinancing the real estate prior to trial. At trial, Mr. Harrington testified that he definitely intended to initiate the process again, but that he was uncertain whether he would be successful given the change in his personal financial situation following the dissolution of the marriage. The trial court found that there was "a strong likelihood, based upon the desire of Motors Holding Corporation and the benefits to Mr. Harrington, that the new plan will be instituted within the next year." Clerk's Papers at 322.

The trial court initially found that the parties possessed community property worth $999,974. Most of this value consisted of the community's interest in Harrington Chevrolet. Finding that Ms. Harrington had "some separate assets," the court divided the property equally between the

---

[1]Ms. Harrington disputes Mr. Harrington's assertion that the new plan contains restrictions regarding the funds that could be used to acquire the class A common stock. Citing Harrington Chevrolet's amended certificate of incorporation, Ms. Harrington contends that the corporation and Mr. Harrington could use any funds available to acquire the class A common stock. The certificate, however, appears to incorporate the old plan under which Harrington Chevrolet was organized. Because the record on appeal does not contain a written version of the new plan, we are unable to review Ms. Harrington's challenge to the accuracy of Mr. Harrington's testimony. The trial court found that Motors Holding Corporation's stocks could be "redeemed" from company profits or from Mr. Harrington's bonuses. Oral Decision on Motion for Reconsideration dated April 14, 1994, Clerk's Papers at 126. Because we have no copy of the new plan in the record for this appeal, this finding is a verity for purposes of our review.

parties. Clerk's Papers at 331.[2] The court awarded Mr. Harrington all of the community's interest in Harrington Chevrolet, which it initially valued at $895,024,[3] all rights and royalties pertaining to Fontminder and FontFiddler software, and miscellaneous personal property. The court awarded Ms. Harrington the community residence, her interests in the testamentary trust and Glen Grant Chevrolet, miscellaneous personal property, and an equalization award of $402,837. The equalization award was to be realized by a 10-year note bearing seven percent interest secured by a pledge of the Harrington Chevrolet stock, payable in equal monthly installments in the sum of $4,677.99 per month over a period of 10 years. The court also ordered Mr. Harrington to pay maintenance of $3,000 per month for 48 months, 80 percent of Ms. Harrington's attorney fees ($64,961), the premiums for Ms. Harrington's COBRA health insurance for 24 months, child support of $831.89 per month for the younger child for five months, and undergraduate college expenses of the children not otherwise covered by scholarships, student loans, or grants.[4]

---

[2]The court later cited its order requiring Mr. Harrington to pay Ms. Harrington's attorney fees and the children's undergraduate college expenses as further justification for the equal division of the parties' assets.

[3]The court adopted the adjusted net asset value approach in determining the value of the Harringtons' interest in Harrington Chevrolet, calculating that interest as follows:

| | |
|---|---|
| Harrington Class B Common Stock (2,681 shares) on Net Asset Value | $735,564 |
| Less 15% minority discount | (110,299) |
| Plus Harrington Preferred Stock value | 119,759 |
| | 745,024 |
| Plus Goodwill | 150,000 |
| Value of Harringtons' interest in Harrington Chevrolet, Inc. | $895,024 |

Clerk's Papers at 302.

[4]At the time of trial, the Harringtons' older child was enrolled at the University of Portland on a partial soccer scholarship, and the younger child was a senior in high school. The record indicates that Mr. Harrington had contributed between $12,000 and $15,000 for three semesters of college tuition by the time of trial.

Following trial, Ms. Harrington filed a motion for reconsideration, requesting that the court eliminate the minority ownership discount used to determine the value of the community's stock in Harrington Chevrolet, and that the court consider as an asset and value the right under Motors Holding Corporation's new plan to purchase additional stock in Harrington Chevrolet at a price well below market value. The trial court granted the motion in part, holding that the minority discount utilized in determining the value of the Harringtons' stock was not justified. The court expressly declined, however, to attribute value to the right to purchase additional stock at a price below market value.

Following entry of supplemental findings and decree incorporating the trial court's ruling on the motion for reconsideration, Ms. Harrington appeals and Mr. Harrington cross-appeals.

## DECISION

*Issue 1: Did the trial court err in failing to include as part of the community assets the Harringtons' ability to acquire Motors Holding Corporation's stock in Harrington Chevrolet at a price below market value?*

Ms. Harrington contends that the trial court erred in failing to include and value as part of the community assets the Harringtons' right to acquire Motors Holding Corporation's stock in Harrington Chevrolet at a discount. She argues that by awarding Mr. Harrington all of the Harringtons' stock in the dealership, the trial court awarded Mr. Harrington a substantial asset without a commensurate equalizing award to her. Mr. Harrington responds that the trial court included the Harringtons' right to purchase Motors Holding Corporation's stock at a discount in its valuation of the community's interest in Harrington Chevrolet, and even if it had not, Ms. Harrington's argument must nonetheless fail because it improperly equates the stock purchase right with a vested stock option.

Contrary to Mr. Harrington's first argument, the trial court expressly declined to include the stock purchase right in its valuation of the Harringtons' interest in Harrington Chevrolet. In its supplemental findings of fact and conclusions of law, the court stated: "The court declines to attribute value to the Motors Holding agreement which allows the purchase of Motors Holding Stock at a par value of $100.00 per share and declines to make any further distributions in favor of the wife." Clerk's Papers at 101. *See also* Clerk's Papers at 133.[5] We must thus determine whether the trial court erred in failing to include and value the Harringtons' stock purchase right as part of the community assets subject to distribution in the dissolution action.

██ In a dissolution action, all property, both community and separate, is before the court for distribution. *Friedlander v. Friedlander*, 80 Wn.2d 293, 305, 494 P.2d 208 (1972); *In re Marriage of Olivares*, 69 Wn. App. 324,

---

[5]Even if we were to look beyond the trial court's express ruling, Mr. Harrington's arguments in support of his assertion that the trial court included the stock purchase right in its valuation would be rejected. Mr. Harrington first argues that Ms. Harrington's expert, Peter Van Tuyl, included the stock purchase right in his valuation of Harrington Chevrolet, rather than segregating it as a separate item. Although this may be true, the trial court did not adopt Mr. Van Tuyl's valuation. Specifically, the trial court did not calculate the value of the Harringtons' common stock by subtracting from the total common stock Motors Holding Corporation's common stock valued *at book value*. Accordingly, whereas Mr. Van Tuyl valued the Harringtons' common stock at $1.41 million, the trial court valued the stock at only $735,564. Thus, Mr. Harrington's first argument is without merit. Second, Mr. Harrington argues that the court incorporated the Harringtons' purchase right into its valuation of Harrington Chevrolet by deleting the minority ownership discount from its valuation. This argument is similarly without merit because the Harringtons' control, or lack thereof, of Harrington Chevrolet is a separate issue from the Harringtons' ability to purchase additional stock at a discount. By deleting the minority ownership discount, the court recognized that Mr. Harrington would, at some point in the foreseeable future, gain control of the corporation. The deletion of the minority ownership discount did not recognize that Mr. Harrington could gain control *at a discount*. Finally, Mr. Harrington argues that the trial court's inclusion of a goodwill component incorporated the Harringtons' stock purchase right. Once again, this argument is without merit because the goodwill component is separate and distinct from the Harringtons' right to purchase Motors Holding Corporation's stock at a discount. Whereas the former is an asset of the corporation, the latter is an asset of or benefit to the shareholder who holds the right.

328-29, 848 P.2d 1281, *review denied*, 122 Wn.2d 1009 (1993). The court must dispose of all of the parties' property which is brought before it. RCW 26.09.080; *Olivares*, 69 Wn. App. at 328. The court has broad discretion in awarding property in a dissolution action, and will be reversed only upon a showing of a manifest abuse of discretion. *In re Marriage of Landry*, 103 Wn.2d 807, 809, 699 P.2d 214 (1985); *Olivares*, 69 Wn. App. at 328. A manifest abuse of discretion is present if the court's discretion is exercised on untenable grounds. *Landry*, 103 Wn.2d at 809-10; *Olivares*, 69 Wn. App. at 328.

■■ Although RCW 26.09.080 requires the court to dispose of all of the property of the parties, it does not define the term "property." For purposes of Washington dissolution actions, property can be tangible or intangible, but it must be something to which there is a right. A mere expectancy is not a right and as such is not property. WASH. STATE BAR ASS'N, WASHINGTON FAMILY LAW DESK-BOOK § 38.2 (1989). Our Supreme Court has said that " '[p]roperty' is a term of broad significance, embracing everything that has exchangeable value, and every interest or estate which the law regards of sufficient value for judicial recognition." *York v. Stone*, 178 Wash. 280, 285, 34 P.2d 911 (1934).

As have the majority of courts, Washington courts have traditionally considered stock options to be property. *See In re Marriage of Short*, 125 Wn.2d 865, 890 P.2d 12 (1995); *In re Marriage of Sedlock*, 69 Wn. App. 484, 849 P.2d 1243, *review denied*, 122 Wn.2d 1014 (1993). A stock option is the right to buy a designated stock at a particular price for a specified period of time. BLACK'S LAW DICTIONARY 986-87 (5th ed. 1979); *Richardson v. Richardson*, 280 Ark. 498, 502, 659 S.W.2d 510, 512 (1983). Although Mr. Harrington argues to the contrary, we conclude that the Harringtons' stock purchase right, even if not identical to a traditional stock option, is sufficiently similar to a stock option to be characterized as property for purposes of the dissolution action. Like a stock option, the stock purchase

right gave the Harringtons the privilege of purchasing Motors Holding Corporation's Class A common stock at a fixed price, par value, regardless of future appreciation in the market value of the stock, and the privilege of purchasing preferred stock at book value regardless of appreciation in market value. Because the stock purchase right was something to which the Harringtons had a vested right, rather than a mere expectancy, the purchase right constituted property for purposes of the dissolution action.

■■ Property is characterized as of the date of its acquisition. *Sedlock*, 69 Wn. App. at 506 (citing *Burch v. Rice*, 37 Wn.2d 185, 190, 222 P.2d 847 (1950)). All property acquired during marriage is presumed to be community property. *Short*, 125 Wn.2d at 870 (citing Harry M. Cross, *The Community Property Law in Washington* (Revised 1985), 61 WASH. L. REV. 13, 28 (1986)). This presumption may be rebutted by establishing that the acquisition fits within a separate property provision. *Short*, 125 Wn.2d at 870.

Separate property includes property acquired before marriage or that is acquired after marriage by gift, bequest, devise, or descent. RCW 26.16.010; *Short*, 125 Wn.2d at 870-71. Separate property also includes the earnings and accumulations of either spouse while living separate and apart. RCW 26.16.140; *Short*, 125 Wn.2d at 871; *Aetna Life Ins. Co. v. Bunt*, 110 Wn.2d 368, 372, 754 P.2d 993 (1988). Community property is all other property acquired by either spouse after marriage that is not separate property. RCW 26.16.030; *Short*, 125 Wn.2d at 871.

■ The characterization of property such as a stock option turns on several inquiries. The court must first determine what type of option is at issue. When the option-holder has the absolute right to exercise the option at any time by payment of the option price, the option is vested and matured. *Everett v. Everett*, 195 Mich. App. 50, 489 N.W.2d 111, 113 (1992); *see also In re Marriage of Hurd*, 69 Wn. App. 38, 45, 848 P.2d 185 (discussing retirement

benefits), *review denied,* 122 Wn.2d 1020 (1993). If the option cannot be exercised until some future date, but the option- holder has an absolute right to exercise the option on that date, the option is vested and unmatured. *Everett,* 489 N.W.2d at 113. If the option cannot be exercised until some future date, and if the exercise of the option is contingent upon a future event, the option is unvested. *Everett,* 489 N.W.2d at 113. *See also* P. Smetka, *"Disposition of Options, Retirement and Other Future Benefits,"* in *Complex Property Division,* WASH. STATE BAR ASS'N SEMINAR HANDBOOK 2-1 (July 1993).

The court must next determine when the option, vested or unvested, is acquired. A vested stock option is acquired when granted. *Short,* 125 Wn.2d at 871. "An unvested employee stock option is not so easily characterized and requires a more complex analysis." *Short,* 125 Wn.2d at 871.

> To determine how unvested employee stock options are characterized under RCW 26.16, a trial court must first ascertain whether the stock options were granted to compensate the employee for past, present, or future employment services. This involves a specific fact-finding inquiry in every case to evaluate the circumstances surrounding the grant of the employee stock options. Unvested employee stock options granted during marriage for present employment services, assuming the parties were not "living separate and apart" under RCW 26.16.140 when the stock options were granted, are acquired when granted. Unvested employee stock options granted for future employment services are acquired over time as the stock options vest.

*Short,* 125 Wn.2d at 873.

If the trial court finds that the stock options were granted to compensate the employee for future employment services, the "time rule" is applied to the first stock option to vest after the parties are found to be "living separate and apart." This is the only stock option that includes both a community effort and a separate effort. Under the "time rule," the percentage of the stock option

constituting community property is the fraction having as the numerator the period of time between the commencement of the spouse's employment by the employer granting the stock option and the date the parties were found to be "living separate and apart," and having as the denominator the period of time between the commencement of employment and the date when the option is exercisable, multiplied by the number of shares which can be purchased on the date the option is first exercisable. *Short*, 125 Wn.2d at 872. Stock options after the first to vest after the marriage has become defunct are the separate property of the option-holder. *Short*, 125 Wn.2d at 874-75.

Here, Ms. Harrington analogizes the stock purchase right to a vested employee stock option, arguing that it was acquired during the marriage and as such was community property. Mr. Harrington disputes this, arguing that because the exercise of the purchase right depends on his ability to refinance the real estate and on the profitability of Harrington Chevrolet, the purchase right was unvested. Ms. Harrington has the better argument. Under the new plan, the Harringtons had the absolute right to purchase Motors Holding's stock at any time by payment of the option price, i.e, book value of the preferred shares and par value of the class A common shares. This right is, by definition, vested and matured. *See Everett*, 489 N.W.2d at 113; *Hurd*, 69 Wn. App. at 45.

That the Harringtons must obtain the funds with which to pay the purchase price does not alter the nature of the right, nor does the particular manner in which the purchase price must be paid. Nothing in the agreement prevents the Harringtons from exercising the purchase right as Harrington Chevrolet generates the requisite funds. This fact distinguishes the purchase right in the present case from unvested options, with respect to which the option-holder does not have the right to exercise the option until some future date, regardless of available funds. *See Short*, 125 Wn.2d 865 (employee stock options,

vested over the course of three years, could not be exercised until vesting date regardless of available funds).

Although Mr. Harrington agrees that the preferred stock can be purchased with funds generated from any source, Mr. Harrington argues that he does not have the absolute right to purchase the Class A common stock at any time by paying the option price because the option is contingent upon a future event, the profitability of Harrington Chevrolet. Motors Holding Corporation requires that the common stock be purchased with corporate profits or with Mr. Harrington's bonuses; thus, Mr. Harrington argues, Motors Holding Corporation has not promised unconditionally to sell him the stock. It wants to make sure that his ability to purchase comes from high sales. But this contingency—will the dealership be profitable enough to generate the necessary funds—has been answered by the trial judge, based upon substantial evidence: yes, it will, and Mr. Harrington will in all likelihood recommence the purchase process within a year of trial and complete the purchase within 10 years. In fact, Mr. Harrington initiated the stock purchase process prior to trial before being temporarily restrained from refinancing the dealership's real estate, thus demonstrating his own confidence in the continuing profitability of the corporation. He testified at trial that he would definitely recommence the process, so long as the trial court did not leave him so financially strapped by obligations to Ms. Harrington arising from the decree that he would be unable to do so. On appeal, Mr. Harrington has not argued that his obligations to Ms. Harrington have left him so financially burdened that he cannot afford to use his bonuses to purchase common stock, thereby limiting his options in terms of exercising the purchase right.

Thus, because the Harringtons had, at the time of trial, both the right and the ability to exercise the purchase right at any time by payment of the option price, we conclude that the purchase right was vested at the time of trial. Vested stock options are acquired when

granted. *Short*, 125 Wn.2d at 871. Under either the old plan or the new plan, Motors Holding Corporation granted the Harringtons the stock purchase right, which they could have elected to exercise at any time. Because the Harringtons acquired the purchase right during the marriage, the right is community property. As such, it was subject to valuation and distribution in the dissolution action, and we conclude that the trial court erred in failing to include and value it as part of the community assets.

Although the parties have expended considerable energy comparing the stock purchase right in this case to employee stock options such as those treated in *Short*, we believe that the purchase right is more analogous to the warrants treated in *Sedlock*. During their marriage, the Sedlocks acquired two investments which carried with them warrants to purchase stock at a predetermined price. Because of dramatic increases in the market value of the stock, the ability to purchase at the predetermined price was quite valuable. *Sedlock*, 69 Wn. App. at 505-06. Because the investments were acquired with community funds and community credit, this court held that they were entirely community property. *Sedlock*, 69 Wn. App. at 506. Because Mr. Sedlock retired a portion of the remaining community obligation for the purchase of the investments with post-separation earnings, however, he was entitled to be reimbursed for his separate contribution. *Sedlock*, 69 Wn. App. at 508. Similarly, here, the Harringtons acquired the right to purchase preferred and common stock at a favorable price during marriage, although, as in *Sedlock*, the payment of the purchase price will occur after marriage.

Ms. Harrington argues that this court should require the trial court to value the purchase right as follows: Under the new plan, which the trial court found would likely be implemented because it is more favorable to the Harringtons than the old plan, the Harringtons have the right to purchase stock which the trial court valued at $1,252,240 for only $452,500; thus, the trial court should

be directed to divide the difference of $799,740 equally and increase Ms. Harrington's property award by $399,870. Although Mr. Harrington does not offer a different formula, the record establishes that Ms. Harrington is unlikely to be able to generate the funds necessary to pay any portion of the purchase price of the preferred stock, and that because she does not earn bonuses from Harrington Chevrolet, she will be unable to generate funds to purchase any portion of the Class A common stock. So it is Mr. Harrington (or Harrington Chevrolet in the case of a stock redemption) who must generate the necessary funds. As was true in *Sedlock*, Mr. Harrington will be entitled to be reimbursed for his separate contributions toward the realization of the community asset here as yet unvalued and undistributed. Moreover, although we have rejected Mr. Harrington's argument that too many contingencies exist for this court to treat the purchase right as vested, some of his arguments possibly may be relevant in valuing the purchase right. Without deciding whether that may be so, we decline to impose any particular valuation formula upon the trial court. Instead, we leave valuation to the sound discretion of the trial court, after hearing any additional evidence that the trial court may deem relevant and material to the valuation of the purchase right, and after both parties have had the opportunity to reflect upon and argue all the relevant factors.

*Issue 2: Did the trial court err in fixing the interest rate on the equalization award at seven percent per annum?*

Ms. Harrington contends that the trial court erred in fixing the interest rate on the equalization award at seven percent per annum, when the maximum statutory rate was 12 percent per annum, and when she requested a rate of eight percent per annum at trial.

■ RCW 4.56.110 requires that interest on judgments shall accrue at the maximum rate permitted under RCW

19.52.020. At the time of entry of the decree in this case, the maximum rate permitted under RCW 19.52.020 was 12 percent per annum. RCW 19.52.020(1). The trial court must enter a judgment in compliance with RCW 4.56.110. *In re Marriage of Knight,* 75 Wn. App. 721, 731, 880 P.2d 71 (1994) (quoting *Safeco Ins. Co. of Am. v. JMG Restaurants, Inc.,* 37 Wn. App. 1, 23, 680 P.2d 409 (1984), *review denied,* 126 Wn.2d 1011 (1995). "Failure to do so constitutes error meriting remand for correction of the judgment's interest rate to the statutory rate." *Knight,* 75 Wn. App. at 731.

■ Although the trial court has discretion to reduce the rate of interest on deferred payments under a property distribution decree, *In re Marriage of Stenshoel,* 72 Wn. App. 800, 811, 866 P.2d 635 (1993) (citing *Berol v. Berol,* 37 Wn.2d 380, 382, 223 P.2d 1055 (1950)), the court abuses its discretion if it fixes an interest rate below the statutory rate without setting forth adequate reasons for the reduction. *Knight,* 75 Wn. App. at 731; *Stenshoel,* 72 Wn. App. at 811-12.

In the present case, Ms. Harrington requested interest at the rate of eight percent per annum. Accordingly, she concedes that she cannot logically now request 12 percent, and we accept that concession. In making its equalization award, the trial court provided for interest at the rate of eight percent per annum. Without setting forth its reasoning, the court stated: "I think 10 years is appropriate here. I'm going to provide for interest in the amount of seven percent on this, payable over a 10-year term, and monthly installments." Clerk's Papers at 332. Ms. Harrington contends that the trial court erred in fixing the interest rate at seven percent rather than eight percent because it failed to provide adequate reasons for the reduction.

Although we observe that the trial court utilized a secured equalization note rather than a money judgment in this particular case, the parties do not distinguish between these two means of dividing marital property. Without deciding the unbriefed issue of whether there

may be any viable distinction between a secured equalization note and a money judgment for purposes of applying the statutory interest rate on property awards in a marital dissolution proceeding, we elect to adhere in this case to the rule that the trial court must state reasons for awarding a party to a marital dissolution any less than the statutory interest rate. Although Mr. Harrington correctly notes that there is evidence in the record establishing the dividend rate on Harrington Chevrolet preferred stock at six percent, and the prevailing long term treasury bill rate at 6.2 percent, there is nothing in the record indicating that the trial court relied on these figures in fixing the interest rate at seven percent. The record is silent in this respect. We reject any notion that it is the task of an appellate court to search the record for any reasons which may or may not have justified the trial court's exercise of discretion.

We do not suggest that the trial court must award eight percent interest merely because that is the amount suggested by Ms. Harrington at trial. But because the trial court failed to provide any reasons for fixing the interest rate below the statutory rate, let alone below the rate suggested by Ms. Harrington, we are unable to determine whether the trial court abused its discretion in choosing seven percent. Accordingly, upon remand, the court is directed either to state reasons for rejecting the eight percent rate requested by Ms. Harrington or to increase the rate to eight percent.

*Issue 3: Did the trial court err in determining that it was just and equitable to divide the community property on equal basis?*

Ms. Harrington contends that, given the parties' disparate economic positions following the dissolution, the trial court erred in determining that it was just and equitable to divide the community property equally. In a dissolution proceeding, the trial court is authorized under RCW 26.09.080 to exercise its discretion in awarding property to

the parties. *In re Marriage of Pearson-Maines*, 70 Wn. App. 860, 864, 855 P.2d 1210 (1993). The trial court has broad discretion in making a property division, and will not be reversed on appeal absent a showing of manifest abuse of discretion. *In re Marriage of Kraft*, 119 Wn.2d 438, 450, 832 P.2d 871 (1992); *Olivares*, 69 Wn. App. at 328. A manifest abuse of discretion is present if the court's discretion is exercised on untenable grounds. *Landry*, 103 Wn.2d at 809-10; *Olivares*, 69 Wn. App. at 328.

RCW 26.09.080 sets forth the factors to be considered by the court in making its property distribution. These factors include, but are not limited to:

(1) The nature and extent of the community property;

(2) The nature and extent of the separate property;

(3) The duration of the marriage; and

(4) The economic circumstances of each spouse at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse with whom the children reside the majority of the time.

RCW 26.09.080.

Although no single factor is dispositive, the economic circumstances of each spouse upon dissolution is of paramount concern. *Olivares*, 69 Wn. App. at 330.

In the present case, the Harringtons' marriage was of substantial duration. As of the date of separation, they had been married more than 20 years, three times the median length of marriages that end in divorce. U.S. BUREAU OF THE CENSUS, STATISTICAL ABSTRACT OF THE UNITED STATES: 1991, Tbl. No. 133 (111th Ed. 1991). Both parties were approximately the same age and in reasonably good health. Both had similar educational backgrounds. As of the time of trial, however, the parties had disparateprospects for future earnings, based on their respectiveemployment experience during marriage. While Mr. Harrington was earning approximately $12,300 per month

managing the parties' Chevrolet dealership and the software enterprises, a situation likely to continue into the foreseeable future, Ms. Harrington was generating no income operating a flower arrangement business. In recognition of her need for financial assistance, the trial court awarded Ms. Harrington maintenance of $3,000 per month for 48 months. *See In re Marriage of Terry*, 79 Wn. App. 866, 871, 905 P.2d 935 (1995) (noting that maintenance may be utilized to more nearly equalize the post-dissolution economic conditions of the parties).

Balancing, to a certain extent, the inequality was Ms. Harrington's separate property. The trial court found that Ms. Harrington held, as her separate property, assets valued at $275,000. In the three years prior to trial, the assets had generated approximately $17,500 in interest income. The trial court cited Ms. Harrington's separate property in its decision to divide the community assets equally between the parties. In further support of the equal division, the trial court relieved Ms. Harrington of any obligation with respect to the children's college tuition, ordering Mr. Harrington to pay all college expenses not otherwise covered by scholarships, student loans, or grants. In addition, the trial court ordered Mr. Harrington to pay 80 percent of Ms. Harrington's attorney fees, totaling $64,961, and to pay for her health insurance for 24 months.

Although not specifically referenced by the trial court as a basis for the equal division, that court cannot have overlooked the fact that Ms. Harrington was awarded a substantial equalizing note, payable with interest over a period of 10 years. Moreover, upon remand, that property award is likely to be substantially increased when the court values and awards the stock purchase right. The interest rate on the property award may or may not increase slightly, depending upon the court's exercise of discretion regarding the interest rate, following our remand. The interest income on the equalizing note, together with the spousal maintenance awarded, helps to

offset the disparity in the parties' respective earning capacities. Ms. Harrington can, if she chooses wisely, reinvest the principal portion of her note payments into income-producing property, thus placing herself on a more equal footing with Mr. Harrington, in terms of income-producing property. Finally, although Mr. Harrington enjoys a much larger earning capacity than does Ms. Harrington, his income will be substantially encumbered over the next 10 years as he assists the parties' sons through college, retires his maintenance and equalizing note obligations to Ms. Harrington and, predictably, exercises the right to purchase the additional stock from Motors Holding Corporation, utilizing bonus income at least in part.

Because the trial court considered all of the above factors in making its determination to divide the community property equally, its determination was not exercised on untenable grounds, and was thus not a manifest abuse of discretion.

*Issue 4: Should this court award Ms. Harrington her reasonable attorney fees and costs on appeal?*

Ms. Harrington has requested an award of attorney fees and costs as allowed by RAP 18.1 and RCW 26.09.140. RCW 26.09.140 states in pertinent part that: "Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs." A party to a dissolution action is not entitled to attorney fees as a matter of right. *Terry*, 79 Wn. App. at 871. In deciding whether to award attorney fees, this court must balance the needs of one party against the other's ability to pay. *Terry*, 79 Wn. App. at 871; *In re Marriage of Lilly*, 75 Wn. App. 715, 720, 880 P.2d 40 (1994).

As required by RAP 18.1(c), Ms. Harrington has filed with this court an affidavit showing financial need. Mr. Harrington has filed an affidavit showing an inability to pay, in the light of his heavy financial obligations under

the decree dissolving the marriage and his income at the time of oral argument for this appeal. Accordingly, we deny Ms. Harrington's request and direct that each party shall bear his or her respective attorney fees for this appeal and cross appeal.

> *Issue 5 (Cross-Appeal): Did the trial court err when it eliminated the minority ownership discount in response to Ms. Harrington's motion for reconsideration?*

The trial court factored a minority ownership discount into its valuation of the parties' stock in Harrington Chevrolet, based on a miscalculation by which it initially determined that it would take Mr. Harrington 180 years to pay the stock purchase price. In support of her motion for reconsideration, Ms. Harrington presented the declaration of her expert, Mr. Van Tuyl, who presented four calculations or scenarios based on different assumptions about profitability and on refinancing the corporation's real estate to redeem preferred stock. By these scenarios, Mr. Van Tuyl predicted that Mr. Harrington could purchase the stock within 4 to 10 years.

In the oral decision following argument on the motion for reconsideration, the trial judge agreed with Ms. Harrington that the initial 180-year calculation was wrong:

> I don't know where I came up with the figure 180 years. It's obviously wrong. I did base the minority discount substantially upon that finding, or that fact. Given the fact that it appears that, in any case, that within a period of about ten years Mr. Harrington is likely to obtain total control of the business, rather than 180 years. Minority ownership discount would not be justified.

Oral Decision on Mot. to Reconsider, Apr. 14, 1994, Clerk's Papers at 125. *See also* Supplemental Findings of Fact and Conclusions of Law, Clerk's Papers at 100-01.

Although Mr. Harrington argues on appeal that Mr. Van Tuyl's calculations presented for the hearing on reconsideration were "just flat wrong," Respondent's Brief

at 39, Mr. Harrington's own calculations, which we derive from his challenges to those of Mr. Van Tuyl contained in Respondent's Brief, suggest that he would likely obtain control of the corporation within 7 to 18 years. The trial court's ultimate determination that Mr. Harrington would likely obtain total control of the business within about 10 years is thus well within the range of each side's calculations.

The trial court also commented that it had initially misunderstood or overlooked the testimony at trial that the stock could be purchased not only from bonuses received from Mr. Harrington but also from the profits of the company. Upon correcting its own misunderstandings, the trial court determined that the minority ownership discount simply was not justified and eliminated it.

We decline Mr. Harrington's invitation to weigh the conflicting evidence presented in support of and in opposition to the motion for reconsideration. That task was ably performed by the trial court, and is not an appellate function in any event. The factfinder has broad latitude in determining the weight to give expert opinion. Where, as here, the trial court's decision falls within the range of expert testimony given at trial and for the motion for reconsideration, and is reasonable in light of all the conflicting expert opinions, the decision is based upon substantial evidence and will be affirmed upon appeal. *Sedlock*, 69 Wn. App. at 491-92.

Affirmed in part, reversed in part and remanded for such further proceedings as shall be consistent with this opinion.

GROSSE and BECKER, JJ., concur.

Reconsideration granted and opinion modified May 5, 1997.