IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of H.G.N-C., | No. 85211-6-I |
| Minor Child. | DIVISION ONE |
| | UNPUBLISHED OPINION |

COBURN, J. — M.C. appeals from an order terminating her parental rights to her daughter, H.G.N-C. She challenges the trial court's finding that she was currently unfit to parent. Because substantial evidence supports that finding, we affirm.

FACTS[1]

M.C. is the mother of H.G.N-C., who was born in December 2018.[2] She has two older children who are in their father's care and were not parties to the proceedings below. M.C. has struggled with addiction since she was 12 years old.

---

[1] The substantive facts in this section are drawn from M.C.'s testimony and the trial court's unchallenged findings, which are verities on appeal. See In re Dependency of A.N.C., 24 Wn. App. 2d 408, 416, 520 P.3d 500 (2022) (unchallenged findings are verities on appeal), review denied, 1 Wn.3d 1012 (2023).

[2] H.G.N-C.'s father, whose parental rights were also terminated in the proceedings below, is not a party to this appeal.

On January 27, 2021, just after H.G.N-C. turned two, M.C. left H.G.N-C. in the care of a drug-involved woman that M.C. had known for "at the most two weeks" while M.C. went to a casino. After a neighbor reported hearing an infant crying for an excessive amount of time, law enforcement responded to M.C.'s apartment and found H.G.N-C. locked into a restraint device and the woman who was supposed to be looking after her "utterly unresponsive" with a crack pipe nearby. H.G.N-C. was taken into protective custody due to M.C.'s substance abuse issues, mental health, and lack of parenting skills. She has remained in out-of-home care since.

On August 18, 2021, the trial court found H.G.N-C. dependent as to M.C. under RCW 13.34.030(6)(c) (no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development). The court ordered M.C. to complete a drug and alcohol evaluation, random urinalysis (UA) testing, and a neuropsychological assessment, and to follow all recommendations. Sarah Potter, a Department of Children, Youth and Families (Department) social services specialist, was assigned to M.C.'s case.

In December 2021, Dr. Dana Harmon completed a neuropsychological assessment of M.C. He recommended that M.C. attend intensive inpatient drug and alcohol treatment, parent coaching, and mental health services focused on intensive therapy interventions. M.C. completed parent coaching in June 2022. Although she attended counseling between November 2021 and February 2022,

she disengaged with her counselor because she did not like what the counselor had to say. She later began therapy with Catharine Peppard.

In the meantime, M.C. completed drug and alcohol evaluations with three service providers, each of which recommended intensive outpatient treatment (IOP). M.C. did not complete IOP following any of these evaluations. In April 2022, M.C. completed IOP at Lifeline Connections. After completing IOP, M.C. disclosed to Crystal Lockhart, her substance abuse counselor at Lifeline Connections, that she had relapsed on methamphetamine. Lockhart then, like Dr. Harmon, recommended intensive inpatient treatment, but M.C. refused to engage in that treatment.

In April 2022, the Department petitioned to terminate M.C.'s parental rights, alleging that M.C.'s parenting deficiencies included mental health issues, substance abuse issues, and lack of parenting skills. A termination trial took place in late March 2023, by which time H.G.N-C. was four years old. The court heard testimony from multiple witnesses, including M.C., Potter, Lockhart, Peppard, Dr. Harmon, a visitation supervisor, and the court appointed special advocate (CASA).

At the conclusion of trial, the court granted the Department's termination petition, finding that the Department had satisfied its burden to prove the statutory prerequisites to termination and that "[M.C.]'s ongoing substance abuse and mental health issues render her unfit to parent." M.C. appeals.

DISCUSSION

M.C. argues that insufficient evidence supports the trial court's finding that

she was currently unfit to parent, and thus, the trial court erred by terminating her parental rights. We disagree.

## Standard of Review and Legal Standards

Parental rights are a fundamental liberty interest protected by the United States Constitution. Santosky v. Kramer, 455 U.S. 745, 753, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982). To terminate the parent-child relationship, the Department must prove six statutory elements by clear, cogent, and convincing evidence. RCW 13.34.180(1), .190(a)(i). Due process then requires the Department to prove, also by clear, cogent, and convincing evidence, that the parent is currently unfit. In re Welfare of A.B., 168 Wn.2d 908, 920, 925, 232 P.3d 1104 (2010). Unfitness means that "the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety." In re Parental Rights to K.M.M., 186 Wn.2d 466, 493, 379 P.3d 75 (2016). If the Department makes these showings, the court may order termination if the Department also establishes by a preponderance of the evidence that termination is in the child's best interests.[3] RCW 13.34.190(1)(b).

On review, we ask only whether the trial court's findings of fact are supported by substantial evidence and whether those findings support the conclusions of law. In re Dependency of P.D., 58 Wn. App. 18, 25, 792 P.2d 159

---

[3] M.C. assigns error not only to the trial court's current unfitness finding but also to its findings on certain other prerequisites to termination. However, she does not support the other assignments of error with argument and authority. Accordingly, we consider only her challenge to the current unfitness finding. See Escude v. King County Pub. Hosp. Dist. No. 2, 117 Wn. App. 183, 190 n.4, 69 P.3d 895 (2003) ("It is well settled that a party's failure to assign error to or provide argument and citation to authority in support of an assignment of error, as required under RAP 10.3, precludes appellate consideration of an alleged error.").

(1990). "We review findings of fact under a substantial evidence standard." In re Dependency of A.M.F., 23 Wn. App. 2d 135, 141, 514 P.3d 755 (2022), aff'd, 1 Wn.3d 407 (2023). "Where the fact at issue must be shown by clear, cogent, and convincing evidence, substantial evidence must demonstrate that fact is 'highly probable.'" Id. (internal quotation marks omitted) (quoting In re Welfare of Sego, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). Nevertheless, we "defer to the trial court's advantage in viewing the proceedings and do not reweigh evidence or determine the credibility of the witnesses." Id. Additionally, "we view the evidence and reasonable inferences drawn from it in the light most favorable to the prevailing party." Id.

Analysis

Here, substantial evidence supports the trial court's finding that "[M.C.]'s ongoing substance abuse and mental health issues render her unfit to parent [H.G.N-C.]."[4]

Dr. Harmon diagnosed M.C. with posttraumatic stress disorder (PTSD), anxiety, recurrent and severe major depressive disorder, and severe substance use disorders (cannabis, alcohol, and methamphetamine). And while Potter testified that one of H.G.N-C.'s basic needs was stability, and even M.C. acknowledged this was so, Dr. Harmon testified that M.C.'s substance abuse had been a "destabilizing, destructive thing in her life." He testified based on

---

[4] M.C. asserts that the trial court also based its unfitness finding on a lack of parenting skills. But the record citation she provides does not support that assertion, and the trial court expressly referred only to M.C.'s ongoing substance abuse and mental health issues in relation to its unfitness finding. Accordingly, we need not and do not reach M.C.'s arguments that the trial court erred by relying on a lack of parenting skills to find unfitness.

information he got from M.C. that her adult relationships "all were relationships with people that were also drug-involved and often violent." He also reported that M.C. "presents as depressed, anxious, emotionally brittle, and overwhelmed" and that her symptoms included "emotional reactivity, use of isolation and/or drug abuse as avoidant coping mechanisms, impulsive, often self-destructive behavior, and avoidant behavior." Dr. Harmon testified that M.C. had

> very strong indications of emotional distress . . . ; despair, upset fearfulness. There were strong indications of thought dysfunction as far as confusion, having difficulty keeping things straight for herself. Coupled with a lot of persecutory ideas that people were after her, even to the point of having a sense that people are following her. A real elevated level of confusion and agitation as far as her thinking.

He noted that M.C. arrived late for her initial interview with him and ended it early because it "just got too upsetting for her," and although she would look at him at the beginning of the interviews, "by the end of each interview, she had turned around completely in her chair." He remarked that "even talking was too overwhelming" for M.C. He also noted that M.C. "showed up really late" for the parent-child observation portion of Dr. Harmon's assessment, "which spoke to some disorganization." And while he was impressed by the emotional bond between M.C. and H.G.N-C. and got a good impression of M.C.'s basic parenting skills, he cautioned that "nothing was going wrong" and "[i]t wasn't a time where [M.C.] was trying to deal with something else at the same time."

Dr. Harmon also testified that M.C. had a "very elevated score" on the Child Abuse Potential Inventory, a screening questionnaire about personality traits associated with a risk for child abuse. Dr. Harmon found this notable in part

because parents are generally "cautious and protective" and will "put a best spin on their behavior" during the evaluation. He testified that "even with that," M.C.'s overall score was "well above the cutoff of risk for child abuse," which he explained in M.C.'s case "seems to reflect [M.C.]'s emotional distress and risk for neglectful, inappropriate behavior." Dr. Harmon, whose assessment included extensive interviews with M.C., various psychological testing, and review of records of M.C.'s prior involvement with the Department, concluded that M.C.'s substance abuse and mental health issues had played a role in her neglect of H.G.N-C., including during the January 2021 incident that led to her removal, and that M.C. was "simply not stable enough at this time to manage the demands of parenting on her own." And he opined that as of January 2022, when he completed his evaluation, M.C. was not able to meet H.G.N-C.'s needs. In short, Dr. Harmon's evaluation and opinion testimony constituted substantial evidence that, as of January 2022, M.C. was unfit to parent H.G.N-C. due to her substance abuse and mental health issues. Cf. In re Marriage of Harrington, 85 Wn. App. 613, 637, 935 P.2d 1357 (1997) ("The factfinder has broad latitude in determining the weight to give expert opinion.").

M.C. does not argue that Dr. Harmon's opinion was not probative of her unfitness as of January 2022 but asserts his opinion was outdated by the time of trial. However, the trial court found that M.C.'s progress addressing both her substance abuse and her mental health issues was both "insignificant and insufficient" and that "[t]he evidence in this case tracks with Dr. Harmon's conclusions." These findings are supported by substantial evidence.

First, contrary to M.C.'s argument otherwise, the record supports the trial court's finding that M.C.'s substance abuse remained ongoing and significant at the time of trial. It is a verity on appeal that M.C. has struggled with addiction since she was 12 years old. M.C. herself testified that she had "done a lot of drugs" in her life, including cannabis, cocaine, and methamphetamine, and that her longest period of sobriety during H.G.N-C.'s life was 18 months, when H.G.N-C. was first born. Dr. Harmon testified that during his assessment, M.C. reported having been to inpatient treatment nine times and to detox treatment a number of times, and that these efforts were unsuccessful. He also testified that M.C. reported using cannabis every day. Between February 2021 and April 2022, multiple service providers evaluated M.C. and recommended IOP, which one witness testified would only be recommended for someone who meets the criteria for a substance use disorder and is currently using. Meanwhile, Dr. Harmon diagnosed M.C. with, among other things, "Stimulant Use Disorder (meth), severe," and "Cannabis Use Disorder, severe."

Additionally, Dr. Harmon opined that "the usual approaches" to treatment were unlikely to help M.C. maintain sobriety over time, and he recommended at least six months of intensive inpatient treatment. But M.C. did not engage in intensive inpatient treatment. Although she completed IOP treatment in June 2022, M.C. testified that she relapsed on methamphetamine within six or seven months of trial, and even though her substance abuse counselor then recommended intensive inpatient treatment, she refused it. M.C. also testified she had used cannabis within a month of trial. Meanwhile, although Potter

8

testified that she referred M.C. for random UAs multiple times a month, including as recently as a month before trial, M.C. testified that she completed only four or five, and Potter recalled that the most recent of those was in fall of 2021. This was despite the random UAs being expressly and understandably offered, multiple service letters stating that missed UAs would be treated as positive UAs, and reminders from Potter of the importance of M.C. documenting her sobriety. Potter testified that she also offered to meet M.C. for oral swabs on multiple occasions, to no avail. And although the court ordered M.C. to complete a hair follicle test, M.C. testified that she was not willing to provide the amount of hair the laboratory requested.

In short, there was evidence that M.C. had a lengthy history of substance abuse that was resistant to traditional treatment modalities, that M.C. did not engage in the intensive treatment necessary to address her abuse, and that despite understanding the stakes, M.C. still refused to provide random UAs and other testing. While M.C. asserts that the trial court improperly shifted the burden of proof by relying on the lack of UAs and other testing as evidence of M.C.'s ongoing substance use,[5] the court reasonably inferred from M.C.'s history, her refusals to test, the absence of necessary treatment, and M.C.'s own testimony about recent use, that M.C.'s substance use at the time of trial was consistent

---

[5] M.C. relies on the concurrence in In re Dependency of A.L.K., 196 Wn.2d 686, 478 P.3d 63 (2020), to support this assertion. That concurrence distinguished services intended to remedy parental deficiencies from requirements (like random UAs) that are actually assessments of the parent. Id. at 706, 708 (Montoya-Lewis, J., concurring). It does not support M.C.'s assertion. To the contrary, even it recognized that assessments like UAs provide the Department with information "to determine whether a family should remain intact." Id. at 708.

with her historical use and remained significant.[6]

There was also substantial evidence to support the trial court's determination that M.C. had not made any significant progress with regard to her mental health issues. Dr. Harmon opined that "[i]f [M.C.] is going to move past her problems and become more stable, she will need intensive therapy interventions with a focus on her trauma and emotional patterns." But M.C. did not engage in those intensive therapy interventions. She points out that at the time of trial, she was attending therapy with Peppard. But Peppard testified that she provided "client-centered" therapy and allowed M.C. to lead their sessions. The trial court found that "[t]he counseling provided by Ms. Peppard is not of a kind that the court can conclude is helpful in addressing the mother's mental health issues," and this finding is supported by substantial evidence: Dr. Harmon testified that M.C. needed "a more directive perhaps at some points confrontive approach than a client-led approach." He explained that client-led therapy is typically for "people who are dealing with minor issues and fairly functional . . . as opposed to working through issues that have been crippling them," and testified that he "would be surprised" if client-led therapy was sufficient for M.C. "to make positive changes over time." To this end, even Peppard testified that M.C. tended to focus on the court case and was resistant to Peppard's attempts to redirect her toward other issues.

Furthermore, Potter testified that M.C.'s impulsiveness and lack of

---

[6] Indeed, holding that the trial court was not permitted to draw such an inference would create a perverse incentive for a parent not to comply with UA and other assessment requirements.

judgment that led to H.G.N-C.'s initial removal were still relevant two years later. She testified that meetings with M.C. were often shortened or interrupted because M.C. would become frustrated and end the conversation "when she is done." Similarly, M.C. disengaged with a mental health counselor in February 2022 because she "did not like what the counselor had to say." She also stopped going to a substance abuse support group because she "didn't find any desire . . . to be there." The visitation supervisor testified that she often had to intervene because of things M.C. would say to H.G.N-C., including asking H.G.N-C. "quite often" about whether she was being abused, and talking to H.G.N-C. about the dependency case. Just a few months before trial, M.C. told H.G.N-C. during a visit that she might not see her again, which upset H.G.N-C. And a month before trial, M.C. left a virtual shared planning meeting after 10 minutes.

Additionally, Dr. Harmon testified that M.C. could not make reasonable progress with her mental health issues until she could move past her persecutory ideas about "what was being done to her and her children." Yet the record reflects that throughout the proceeding and even up through trial, M.C. fixated on her claim that H.G.N-C. was being sexually and physically abused in the Department's custody, even though those claims were investigated and determined to be unfounded. M.C. cited those claims to justify her refusal to provide court-ordered releases of information to the Department so that it could assess her progress, explaining, "I don't trust anybody that's not in support of keeping my child safe while in protective custody." She also cited those claims to

11

explain why she did not trust Potter and had not had a one-on-one with her for a long time, stating, "I am having a really hard time communicating with people that are protecting abuse for my child." In other words, M.C.'s persecutory ideas prevented her from taking the necessary steps toward what even she believed was in H.G.N-C.'s best interests, i.e., reunification. At the same time, M.C. attributed her mental health issues to her child being withheld from her, and she testified that she "really d[id]n't care" what Dr. Harmon recommended because "his evaluation was pretty far off and farfetched on all the things," thus indicating a lack of insight. Cf. In re Welfare of H.S., 94 Wn. App. 511, 528, 973 P.2d 474 (1999) (a parent's lack of insight into their condition may be considered in determining unfitness). Even Peppard testified that at the time of trial, M.C. was only "becoming motivated" to address her issues.

In short, there was substantial evidence, in the form of Dr. Harmon's assessment, that M.C.'s substance abuse and mental health issues rendered her unfit to parent H.G.N-C. at the time of his evaluation. There was also substantial evidence that M.C.'s circumstances had not materially changed since that evaluation. Accordingly, the trial court did not err by finding that M.C. remained unfit to parent at the time of trial. Cf. In re Dependency of J.C., 130 Wn.2d 418, 428, 924 P.2d 21 (1996) ("[P]ast history is a factor that a court may consider in weighing a parent's current fitness.").

M.C. disagrees and argues that reversal is required because the Department failed to show that her deficiencies presented "an immediate or severe risk" to H.G.N-C.'s safety. In support, she relies on In re Welfare of A.B.,

181 Wn. App. 45, 323 P.3d 1062 (2014). In A.B., the trial court terminated the mother's parental rights based on a finding that her cognitive impairments "resulted in a lack of understanding of child development stages and difficulty identifying *certain subtle dangers*." 181 Wn. App. at 64 (emphasis added). We held this was insufficient to establish unfitness, observing that "it is not highly probable that [the child] will be harmed by [the mother]'s inability to recognize *subtle* safety risks," as distinct from "immediate or severe risk[s] to the child's safety." Id. at 64-65.

M.C.'s reliance on A.B. is misplaced. While a parent's failure to recognize immediate or severe risks to her child's safety is *sufficient* to show unfitness, A.B. did not hold that it is *necessary*. Instead, as discussed, the standard is whether "the existing parental deficiencies, or other conditions, prevent the parent from providing for the child's basic health, welfare, and safety." K.M.M., 186 Wn.2d at 493. To this end, in A.B., the child was removed from the mother's care due to the risk posed by the mother's partner's abusive behavior, and in reversing, we observed that the mother removed this risk by, among other things, ending that relationship and completing all of her domestic violence-related services. Id. at 49, 62. Here, by contrast, the evidence supports the trial court's finding that M.C. failed to remedy the mental health and long-standing substance abuse issues that precipitated H.G.N-C.'s initial removal. A.B. does not control.

In her briefs, M.C. also cites to In re Dependency of T.L.G., 126 Wn. App. 181, 108 P.3d 156 (2005), and In re Welfare of C.S., 168 Wn.2d 51, 225 P.3d 953 (2010), for the proposition that mental illness and past substance abuse

issues alone do not render a parent unfit.  This is true.  But M.C.'s mental health and past substance abuse were not the sole bases for the trial court's unfitness finding.  Again, the trial court found M.C. unfit because of her failure to remedy the issues that Dr. Harmon opined would place H.G.N-C. at risk of neglect.  As the trial court put it in its oral ruling, "If in the future [M.C.] . . . were still making all of the necessary judgments and decisions and caring, or not, for her child according to the dictates of her illnesses, [H.G.N-C.] would be in a very precarious, even dangerous, situation," and it was not satisfied that "she would be cared for consistently and safely."  Furthermore, unlike in C.S., where the mother successfully completed substance abuse treatment and remained sober as verified by twice-a-week UAs, 168 Wn.2d at 54, and T.L.G., where the parents showed willingness to address their mental health but were offered no mental health services, 126 Wn. App. at 205-06, here, the record shows M.C. did not improve despite services having been expressly and understandably offered and provided.  T.L.G. and C.S. do not require reversal.

Finally, M.C. points to the visitation supervisor's testimony about the warm relationship and positive interactions between M.C. and H.G.N-C. and M.C.'s own testimony that she had clothes and housing for H.G.N-C., understood H.G.N-C.'s needs, and intended to enroll her in early schooling.  M.C. argues that such evidence affirmatively demonstrated that she was not currently unfit.  But the trial court gave this evidence little weight because, as it explained in its oral ruling, it demonstrated only what M.C. could do "in a controlled environment."

M.C. essentially asks us to reweigh this evidence, which we will not do.

We affirm.

_Coburn, J._

WE CONCUR:

_Birk, J._     _Brennan, J_