[No. 31022-4-I.   Division One.   December 30, 1993.]

*In the Matter of the Marriage of* PEGGY L. STENSHOEL, *Appellant, and* PAUL C. STENSHOEL, *Respondent.*

*Douglass A. North* and *Maltman, Reed, North, Ahrens & Malnati, P.S.,* for appellant.

*Peter D. Preston* and *Stamper & Taylor, P.S.,* for respondent.

COLEMAN, J. — Peggy L. Stenshoel appeals the trial court's decree of dissolution, arguing that the trial court erred by (1) treating property settlement payments as income in calculating child support, (2) relying on draws from the business rather than the business's earnings in calculating Paul's income, (3) deducting the cost of hiring a bookkeeper from Paul's income, (4) improperly reducing the value of the business, (5) refusing to deduct costs of sale from the value of the house, (6) providing for an inadequate rate of interest, (7) not awarding maintenance to Peggy, and (8) refusing to award attorney fees to Peggy. We affirm in part and reverse in part.

Peggy and Paul Stenshoel were married in 1980 and had three children, Christopher (13 years old), Matthew (11 years old), and Michelle (8 years old). In 1987, Paul and Peggy moved to Seattle and purchased Marsten Northwest, Inc., a corporation that supplied construction materials to contrac-

tors. They both participated in the business — Paul managed the operation, and Peggy did the bookkeeping.

In early 1991, the parties separated. In March 1991, Peggy petitioned for dissolution of the marriage. The trial court made Peggy the primary custodian of the children, ordered Paul to pay $512 per month in child support, and divided the couple's property, awarding Paul the business and Peggy the home. To equalize the property division, the trial court gave Peggy a lien on Marsten Northwest in the amount of $109,000 and ordered Paul to make monthly payments to Peggy of approximately $1,200. The trial court denied Peggy's requests for maintenance and attorney fees. Peggy appeals.

## A
### STANDARD OF REVIEW

██ Trial court decisions in dissolution proceedings will seldom be changed on appeal. The party who challenges a decision in a dissolution proceeding must demonstrate that the trial court manifestly abused its discretion. *In re Marriage of Griffin*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). "A manifest abuse of discretion is a decision manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *In re Marriage of Thomas*, 63 Wn. App. 658, 660, 821 P.2d 1227 (1991) (quoting *In re Marriage of Tower*, 55 Wn. App. 697, 700, 780 P.2d 863 (1989), *review denied*, 114 Wn.2d 1002 (1990)).

## B
### CHILD SUPPORT

We initially consider whether the trial court erred by treating property settlement payments as income in calculating child support.

██ RCW 26.19.071(1) provides that all income and resources of each parent's household shall be considered by the court in determining each parent's support obligation. RCW 26.19.071(3) provides that "monthly gross income shall include income from any source", including, among other items listed, "contract-related benefits". Because the term "contract-related benefits" is not statutorily defined, it is "presumed that

it is to be accorded its ordinary meaning." (Footnote omitted.) *Feminist Women's Health Ctr. v. Codispoti*, 118 Wn.2d 99, 105, 821 P.2d 1198 (1991).

In the present case, the trial court found:

Father's gross income is $53,000.00 per year, from that should be subtracted the property payments he is making to wife. Wife's gross monthly income is $750.00, however payments she receives for property from husband should be added to this figure to determine her total income.

In its oral decision, the trial court explained that it included the property payments in Peggy's income because they constituted "contract income". Peggy argues that the trial court erred in making this determination.

Peggy cites *Griffin* for the proposition that a property division is not a reason to deviate from the child support schedule. However, *Griffin* involved a specific provision, which lists among the reasons for deviation "a significant disparity in the living costs of the parents due to conditions beyond their control[.]' " *Griffin*, at 778. The court held that the award of the home to the wife pursuant to a property division did not constitute something beyond the control of the parties and therefore did not support a deviation. *Griffin*, at 778. However, *Griffin* does not provide any guidance on the issue of whether property distribution payments can be treated as income.[1]

Nonetheless, we agree with Peggy that the trial court erred in including the payments as income. As Peggy points out, the property distribution was made pursuant to a court order and is therefore not a contract-related benefit. Even if

---

[1] Also, in *Griffin*, the issue was whether the trial court could deviate from the standard calculation, whereas here the trial court did not deviate from the standard calculation, but used the monthly payments as income in calculating the parent's support obligation.

Peggy also argues that because the statute defining income specifies items such as "spousal maintenance actually received", but does not list property distribution payments, those items were intentionally excluded. RCW 26.19-.071(3)(q). However, RCW 26.19.071(4) lists items that are to be excluded from income, and property distribution payments are not among those listed. Therefore, the statute is not particularly helpful on this issue.

the property distribution decree could be considered a type of contract, the payments cannot be characterized as "benefits" because they represent property Peggy already owns, *i.e.*, they represent Peggy's share of the community property.

Furthermore, we believe that under the circumstances presented here, considering the payments as income or benefits contravenes the principles behind the community property system. In dividing the property, the trial court attempted to achieve a roughly equal distribution. However, by considering the payments as income to Peggy and deducting them from Paul's income, the trial court substantially reduced the value of Peggy's share of the property, thereby undermining the fairness of the distribution.[2] We believe that it is inequitable to require Peggy to unilaterally exhaust her share of the community business to support the children. Therefore, we conclude that the trial court abused its discretion in considering the property distribution payments as income. The amount of the payments should not be added to Peggy's income or subtracted from Paul's.[3]

We next consider whether the trial court erred in basing Paul's income on community draws from the business, rather than on the business's earnings.

The legislative intent behind the child support schedule is to "insure that child support orders are adequate to meet a

---

[2]The trial court's use of a monthly payment method to divide the property does not change the fact that Peggy is merely being compensated for a valuable community asset that was awarded to Paul in the property distribution. As Peggy points out, if she had been paid a lump sum of $109,200 (her share of the business, according to the trial court), it would not have been reasonable to include that amount as income in the month received.

Peggy concedes, however, that because the trial court used a monthly payment method, the portion of the payments representing interest paid on the obligation may constitute income.

[3]We note, however, that the child support schedule does allow the trial court to consider all income *and resources* of each household. Therefore, we believe that in an appropriate case, property distribution payments could properly be considered a resource to be taken into account when determining whether to deviate from the support schedule.

child's basic needs and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. In the present case, Peggy argues that the trial court underestimated Paul's income by basing it on previous community draws from the business, rather than on the business's actual earnings.[4]

Peggy urges this court to adopt the approach followed by Pennsylvania courts, which have held that a business's retained earnings should be considered income to the business's sole owner, absent a legitimate business need to retain the earnings. Peggy cites two Pennsylvania cases, *King v. King*, 390 Pa. Super. 226, 568 A.2d 627 (1989) and *McAuliffe v. McAuliffe*, ___ Pa. Super. ___, 613 A.2d 20 (1992).

In *King*, the trial court, in calculating the husband's income for purposes of spousal and child support, attributed the retained earnings of the husband's partnership to the husband. *King*, at 231. The appellate court agreed with this approach, stating:

> To allow husband to shield substantial income of his business from consideration in determining his support obligation without more evidence as to a legitimate need to do so would allow spouses with support obligations to evade their obligations by unilaterally reducing their income.

*King*, at 231.

In *McAuliffe*, the husband, sole shareholder of a paving company, argued that because his income had decreased due to a substantial increase in cash outlays for business equipment, he was entitled to a reduction in his support obligation. *McAuliffe*, at 22. The trial court found that the cash outlays were not necessary for the business, and the appellate court agreed, stating:

---

[4]At trial, Peggy's accountant testified that the business earned $9,500 per month ($114,000 per year). The trial court declined to use this figure as Paul's income. Based on the couple's tax returns from 1990 and 1991, the trial court found that the community's income from the corporation was $71,000. To arrive at Paul's income, the court reduced this figure by the amount of the property distribution payments to Peggy and the cost of hiring a bookkeeper.

> [D]epreciation and depletion expenses should be deducted from gross income only where they reflect an actual reduction in the personal income of the party claiming the deductions, such as where, *e.g.*, he or she actually expends funds to replace worn equipment or purchase new reserves.

*McAuliffe*, at 23 (quoting *Cunningham v. Cunningham*, 378 Pa. Super. 280, 282, 548 A.2d 611, 613 (1988), *review denied*, 522 Pa. 576 (1989)). Thus, these cases support Peggy's claim that absent a business necessity for retaining the earnings, a business's earnings should be attributed to its sole owner.

■ Although we agree that the Pennsylvania approach is sound, we do not believe that the trial court abused its discretion in using previous community draws to determine Paul's income. The community draws adequately reflect the parties' income prior to the divorce.[5] Roland Nelson, the accountant employed by Peggy to assess the business's value, stated in his report that $70,000 was "reasonable compensation" for the corporation's officers. Also, because the figures came from the parties' joint tax returns and the corporate returns from the previous 2 years, this was not a situation where Paul unilaterally could have shielded income from consideration by the court. Thus, it cannot be said from the record that the trial court abused its discretion by basing Paul's income on previous community draws from the business.

■ Nonetheless, we agree with the Pennsylvania approach and conclude that when making the periodic adjustments required by the decree, Paul must account for any retained corporate earnings. By placing the burden of justifying retained earnings on Paul, the trial court will be able to better ensure that the amount of child support remains commensurate with Paul's actual income and resources.

Peggy next contends that the trial court erred by deducting the cost of hiring a bookkeeper from Paul's income.

---

[5]Peggy claims that the corporation paid the Stenshoels' house payment, personal taxes, medical insurance premiums, and a portion of Paul's vehicle expenses. However, because it is not clear from the record to what extent these items were or were not included in the community income, we decline Peggy's request to add the amount of these items to Paul's income.

As discussed above, the trial court based Paul's salary on previous community draws from the business ($71,000), not on the business's total income. The trial court then reduced this amount by the monthly payments to Peggy and by the amount needed to hire a bookkeeper ($18,000). The following exchange occurred during the court's oral ruling:

> [THE COURT:] With regard to child support, the income from the corporation to this community was 71 thousand dollars a year last year. . . . Now that income will be reduced for two reasons. One is that there will now be a monthly payment which was not required previously, and he will have to hire a bookkeeper that was not required previously. . . .
>
> MS. HAMMERLY: There was a bookkeeper all [of] last year. She was hired in about May or April — March.
>
> THE COURT: I didn't have any testimony on that, other than a bookkeeper was required.
>
> MR. PRESTON: I am sure the Court doesn't want to reopen. I can tell you what the salary is. I don't think the Court wants us to interrupt, so —
>
> THE COURT: I am going to reduce it by the monthly payment and 18 thousand dollars a year for the bookkeeper.

Peggy argues that the trial court erred in deducting $18,000 from Paul's income to pay for a bookkeeper because that expense had already been deducted.

We agree. The evidence and the testimony showed, and Paul did not refute, that a new bookkeeper was hired in 1991 and was paid $17,712. On the corporate tax return for 1991, this expense was listed separately from the compensation paid to Paul and Peggy. Therefore, because the bookkeeper's salary was paid by the corporation and was already accounted for, Peggy is correct that the trial court erred in subtracting the amount of the salary from Paul's income.[6]

## C
### PROPERTY DIVISION

The next issue Peggy raises is that the trial court erred in reducing the value of the business.

---

[6] Also, because the trial court did not base Paul's income on the corporation's earnings, the bookkeeper's salary would have no effect on Paul's income in any event, provided the corporation's earnings continued to be sufficient to cover both.

Peggy's expert, Roland Nelson, valued the business at $303,300. The trial court valued the business at $278,000, reducing Nelson's figure by $25,000. Peggy claims that the reasons given by the trial court for the reduction were not supported by the evidence.

The trial court based the reduction on Paul's testimony, which indicated that there were additional shareholder draws and other liabilities that Mr. Nelson's report had not taken into account.[7] Peggy claims that the trial court itself did not believe Paul's testimony but nonetheless proceeded to reduce the value of the business. However, although the trial court's statements are ambiguous, the trial court apparently accepted Paul's testimony regarding the *existence* of some additional liabilities, but rejected his testimony regarding the *extent* of some of those liabilities.[8]

Peggy also claims that the $25,000 subtracted by the trial court included $6,000 in attorney fees that the court had initially required the corporation to pay, but that were later

---

[7]Although Nelson's report did account for "bad debts", Paul's testimony indicated that because of previous problems with the business's accounting system, the extent of the bad debts was understated.

[8]The following statements indicate the trial court's reasons for reducing the amount:

"Mr. Stenshoel testified that the values used by Mr. Nelson in appraising the property is [*sic*] based upon books by an accountant that was performing less than satisfactorily and the values on certain items, particularly the accounts receivable and the inventory, were overstated; and though he made an effort to adjust those, he felt that the adjustment presented to Mr. Nelson was not adequate, and, upon further examination by his present accountants, that the actual value of those stated it something like two hundred thousand plus dollars or something, almost three hundred thousand dollars. It was actually worth about 150 thousand dollars, so there was a difference of a hundred thousand dollars. That is not substantiated. · ·

"They show shareholder draws in the amount of 25 thousand dollars, which were not substantiated. *But he did point to a couple of items which seemed to indicate there were some shareholder draws outstanding which were not deducted from the business property.* So I am going to reduce the gross value of 303 thousand by 25 thousand, having a net value of 278 thousand." (Italics ours.)

rescinded. However, the excerpt from the record which Peggy cites is extremely ambiguous and does not support this claim.[9]

Peggy also cites *In re Marriage of Thomas*, 63 Wn. App. 658, 821 P.2d 1227 (1991) to support her contention that the trial court erred in allowing the $25,000 reduction. *Thomas*, however, involved an entirely different situation. In that case, the husband provided no testimony regarding expenses associated with the community rental property and ignored two court orders requiring him to account for the rental proceeds. The Court of Appeals held that the husband had the burden of accounting for the rental proceeds and that the trial court abused its discretion "by failing to determine the amount of net rental proceeds and divide them equitably." *Thomas*, at 664.

■ Here, on the other hand, Paul did testify regarding why he believed Nelson's valuation of the business was inflated, and the trial court made the appropriate findings regarding the business's value. It was within the trial court's discretion to assess the credibility of Paul's testimony. This testimony was sufficient to support the trial court's reduction of the business's value by $25,000, and we therefore reject Peggy's claim.

We next address whether the trial court erred by refusing to deduct the costs of sale from the value of the house.

■ A deduction for the costs of sale is justified when (1) the evidence shows that the party who will receive the assets intends an imminent sale, and (2) the evidence supports the estimated costs of sale. *In re Marriage of Berg*, 47 Wn. App. 754, 759, 737 P.2d 680 (1987). In *Berg*, the court held that

---

[9]Peggy claims that the following exchange supports her claim that the $25,000 amount included $6,000 in attorney's fees:

"Q: Now, as far as debts are concerned, you list on page 6 personal draws to corporation including taxes approximately $25,000. Is that — are you familiar enough with the corporation records to know what the exact amount of the loans to shareholders and liabilities are for these court-ordered payments which have been ordered or the tax payments which you previously made?

"A: I know them somewhat."

the trial court did not err in refusing to deduct the costs of sale because the issue was raised for the first time in a posttrial motion, the appellant's intent to sell was not sufficiently definite, and it was not clear that the sale was imminent. *Berg*, at 759-60.

Here, the trial court refused to deduct the costs of sale, stating:

> As to the value of $91,000, there was a request to reduce the value by the sales costs. I am not reducing the value of the home by the sales costs, because the home is not required to be sold as a result of dividing this property or any order entered by this court. If it is sold, it will be sold to permit Ms. Stenshoel to move to Idaho and transfer the family home there, which is something that is within her decision. If she doesn't move, there is no necessity to sell the home.
>
> So, therefore, the selling of the home is a personal choice of hers and it would not be appropriate under those circumstances to reduce the value by the sales costs.

Peggy argues that the trial court's refusal to deduct the costs of sale was an abuse of discretion. We disagree.

■ It was within the trial court's discretion to deny a deduction for the costs of sale. There was no evidence, and Peggy does not argue, that she needed to move because of financial concerns. As the trial court noted, Peggy's decision to sell the house and move to Idaho was a personal one. Under these circumstances, it was reasonable for the trial court to conclude that Peggy should pay the costs of sale and that such costs should not affect the equitable distribution of the property.

We next determine whether the trial court erred in providing for interest at less than the statutory rate.

■ A trial court abuses its discretion when, absent a sound reason, it fails to provide for interest when ordering deferred payments under a property distribution decree. *Berol v. Berol*, 37 Wn.2d 380, 382, 223 P.2d 1055 (1950). In *Berol*, the court stated:

> [W]hile in a divorce case the trial court may, in a proper exercise of its discretion, reduce the rate or eliminate interest entirely on deferred payments which are part of the adjudication of prop-

erty rights, *there should be some apparent reason for giving one spouse the use, for business purposes, of the money of the other without interest or at less than the statutory rate.*

(Italics ours.) *Berol*, at 383.

Here, when ordering the property distribution payments, the trial court provided for interest of 6 percent. The court also provided that "[i]n the event that the entire lien is paid on or before April 30, 1994, no interest shall be due and owing and all payments made prior thereto shall be construed as payments on the principal." Peggy argues that the trial court abused its discretion by failing to provide for the statutory interest rate of 12 percent on the deferred payments.

Peggy's argument is partially correct. It is clear that the early payoff provision set forth above is meant to benefit Peggy by encouraging Paul to pay his obligation as soon as possible. Thus, an adequate reason exists for that provision.

However, we agree that the trial court erred in setting the interest rate at 6 percent without stating any reasons for lowering the rate below the statutory rate of interest. *See Berol*, at 383. Paul argues that 6 percent is a reasonable rate of interest. However, the case law clearly states that the trial court must give adequate reasons when it provides for less than the statutory rate. We therefore conclude that the trial court abused its discretion in providing for inadequate interest on the property distribution payments.

### D
#### MAINTENANCE

We next determine whether the relative economic circumstances of the parties require Paul to pay maintenance to Peggy.

RCW 26.09.090 provides that a trial court may award spousal maintenance, after consideration of a number of factors, including the financial resources of the party seeking maintenance, the time necessary for reeducation or retraining, the standard of living established during the marriage, and the financial situation of the payer spouse. The para-

mount concern in determining issues of property division and maintenance is the economic condition in which a dissolution decree leaves the parties. *In re Marriage of Washburn*, 101 Wn.2d 168, 181, 677 P.2d 152 (1984).

Peggy argues that a huge disparity exists between her income and Paul's income. Although we agree that a disparity between the parties' incomes exists as the decree now stands, we have determined that this disparity is not as large as Peggy claims.[10] In addition, the recalculation of the parties' incomes required by this opinion should eliminate much of this disparity, as well as any discrepancy between Peggy's costs and her income. Therefore, we conclude that Peggy is not entitled to maintenance.

### E
### ATTORNEY FEES

Finally, we consider whether either party is entitled to attorney fees.

After considering the financial resources of both parties, the trial court has discretion under RCW 26.09.140 to award attorney fees. The trial court must balance the needs of the spouse requesting them with the ability of the other spouse to pay. *Kruger v. Kruger*, 37 Wn. App. 329, 333, 679 P.2d 961 (1984) (citing *In re Marriage of Harshman*, 18 Wn. App. 116, 128, 567 P.2d 667 (1977)). In addition, RCW 26.09-.140 and RAP 18.1 allow reasonable attorney fees to be awarded on appeal.

In the present case, the trial court concluded that the parties were equally able to pay their own attorney fees. Peggy argues that, given the parties' disparate financial situations, the trial court abused its discretion in making this determination. Paul, on the other hand, argues that Peggy was awarded the only liquid asset of the relationship (the Keogh account worth $23,000) and that Peggy, if anyone, should be required to pay Paul's attorney fees.

---

[10]This is because Peggy's calculation is based on the incorrect assumption that Paul's income is $9,500 per month.

We conclude that the trial court did not abuse its discretion in refusing to award either party attorney fees. The property distribution was roughly equal and, in view of the totality of the circumstances presented, the parties should be equally able to pay their own attorney fees. For the same reason, neither party will be awarded attorney fees on appeal.

## F
### CONCLUSION

The decree is affirmed in part and reversed in part. The following is a summary of the changes in the decree required by this opinion: (1) because the bookkeeper's salary and the amount of the property distribution payments were improperly subtracted from Paul's income, Paul's income for purposes of recalculating any back child support owed from the original decree should be $71,000; (2) Peggy's income for recalculating any back child support owed by Paul from the original degree should not include the amount of the property distribution payments; (3) in making any of the periodic adjustments required by the decree, Paul must justify any earnings retained by the corporation; and (4) interest to be paid by Paul, if any, on Peggy's share of Marsten Northwest must reflect the statutory rate, and the portion of the property distribution payments representing interest on the judgment, if any, should be added to Peggy's income.[11]

In order to recalculate the amount of child support and property distribution payments, we remand the case to the trial court with instructions to adjust the decree in accordance with this opinion.

PEKELIS, A.C.J., and AGID, J., concur.

---

[11]As stated, *supra*, if Paul pays the entire amount of the property distribution within the 2-year period, no interest is due.