# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Parenting and Support of:<br><br>K.G.-S.,<br><br><div align="right">A minor child.</div> | No. 55619-7-II<br><br>UNPUBLISHED OPINION |

Cruser, A.C.J. — Janene Gordon and Scott Serven had a child together, KG-S, during the course of their romantic relationship. After several years of attempting to informally agree on Serven's visits and child support obligations, Gordon filed a petition for a parenting plan and child support order. Following a bench trial, the trial court entered final orders that provided for joint decision-making authority to the parents, a shared residential schedule with alternating weeks, and a $3,500 per month child support payment from Serven to Gordon. In a later order, the trial court also ordered that KG-S shall attend a public elementary school near Gordon's home.

Gordon appeals, arguing that the trial court abused its discretion when it ordered the above provisions. Regarding child support, Gordon challenges the figures that the trial court used for the parties' monthly incomes and the $3,500 monthly payment. Gordon also appeals the trial court's order regarding KG-S' schooling on the basis that it relied on an erroneous allocation of

decision-making authority. In addition, Gordon challenges two of the trial court's orders awarding some, but not all, of her attorney fees.

We hold that the trial court abused its discretion in ordering that the parties have joint decision-making and a shared residential schedule with alternating weeks. Accordingly, we reverse the trial court's parenting plan and the trial court's order regarding KG-S' schooling, as this order was based on an erroneous allocation of decision-making authority. In addition, the trial court did not abuse its discretion in calculating Serven's monthly income, but it did abuse its discretion in the amount of income it imputed to Gordon and the amount it set for child support payments. Accordingly, we reverse the trial court's child support order. We also hold that the trial court abused its discretion by awarding Gordon only a portion of her attorney fees because, given the significant disparity of resources between the parties, the trial court's decision on fees was patently unreasonable. Accordingly, we vacate the attorney fee awards and remand for the trial court to reconsider the attorney fee awards. With respect to attorney fees on appeal, we deny Gordon's motion to compel Serven to file a financial affidavit, but nevertheless award attorney fees to Gordon on appeal.

We reverse and remand to the trial court for proceedings consistent with this opinion. On remand, we order that a different judge shall oversee the proceedings.

FACTS

I. BACKGROUND

The parties met in 2013 when Gordon was working as a real estate agent at a development that Serven was building. Gordon and Serven became involved romantically, and Gordon became pregnant with their child, KG-S, who was born in April 2015. Prior to KG-S'

birth, Serven provided Gordon with financial assistance, and he paid varying monthly amounts of support after KG-S was born.

Serven saw KG-S only sporadically during the early years of KG-S' life. To arrange visits, Serven would reach out to Gordon and ask to see KG-S, and Serven would visit KG-S at Gordon's home.[1] When the parties dealt with interpersonal conflicts, it interrupted Serven's visits with KG-S. Gordon and Serven's relationship continued off and on, but it ended in 2018.

In 2019, when KG-S was four years old, Gordon filed a petition and motion for a temporary parenting plan and child support order, requesting sole decision-making and limited, supervised visits for Serven. Gordon asked for sole decision-making because Serven, up to that point, had limited contact with KG-S and never made a decision for KG-S. Serven, in response, filed his own motion for a temporary order requesting unsupervised visits with a phase-in residential schedule and joint decision-making.[2]

## II. TRIAL

The parties proceeded to a bench trial to determine a permanent parenting plan and child support order. At the start of trial, the court explained:

> Just so everyone understands, the Court adheres very closely to [RCW] 26.09.187, which states where those limitations, [under RCW] 26.09.191, are not dispositive, the Court may order that the child frequently alternate his or her residence between the households of the parents for brief, and this is the important part, substantially equal intervals of time if such provision is in the best interest of the child. That tells

---

[1] The parties agreed that the visits were at Gordon's home, but with conflicting reasons as to why. Gordon testified that Serven wanted her to be present during the visits, and Serven testified that Gordon required the visits to be at her home. This was one of many disputed facts throughout the trial.

[2] By the time of trial, Serven had requested a 50/50 residential schedule beginning during KG-S' 2021-22 school year.

3

me that the legislature has indicated that that's the presumption for parenting plans in Washington.

The presumption is also that it's joint decision-making in all parenting plans unless there are limitations under 191, and the Court adheres very closely to that. So I will ask you, during this trial, that you adhere to Subsection 3, which are the factors under the residential provisions portion of the statute.

2 Report of Proceedings (RP) (Jan. 20, 2021) at 29.

In addition to the facts above, the following testimony was adduced at trial.

Gordon was residing in Puyallup with KG-S and her daughter from her prior marriage. She also has a son from her prior marriage, and he lives with Gordon's ex-husband. KG-S frequently interacts with Gordon's other two children, and Gordon describes KG-S' relationship with these siblings as very close. The trial court asked Gordon if there were any issues that led to her son no longer living with her, and she responded that there came a time when he just preferred to live with his father.

The court also asked Gordon why her income had dropped off in the past few years. Gordon explained that, in general, her earnings were impacted by a lack of child care. After the court pointed out that she made over $70,000 in 2017, she explained that she would have a babysitter or her daughter watch KG-S if she had appointments. Gordon also testified that some years in real estate "just happen to be better than others." 3 RP (Jan. 21, 2021) at 304. Furthermore, in 2017, she was able to complete sale transactions on her own, but in 2020, she had to share her earnings because she needed assistance completing transactions due to surgery and related complications. She also claimed unemployment for a few months during 2020 due to shutdowns during the COVID-19 pandemic. In addition, during 2020 and into 2021, she was taking precautions to ensure that KG-S was safe because of concerns she had for his health.

Gordon explained elsewhere in her testimony that she was particularly concerned about KG-S contracting COVID-19 because he had RSV[3] when he was younger. The court remained "at a loss for what prevents [Gordon] from earning a higher income." 3 RP (Jan. 21, 2021) at 306.

Also affecting Gordon's earnings was the fact that she was teaching KG-S under a remote learning program. KG-S was enrolled at a private school, Cascade Christian, and on the first day of school in person, he came home congested. At a doctor's appointment later that day, the doctor suggested home school if Gordon was concerned about KG-S' health while attending school in person during the 2020-21 school year. Cascade Christian's remote learning program was through Liberty University, but the tuition was still paid by Serven to Cascade Christian. Under the program, there were no teachers for the students, so Gordon had to teach KG-S and help him through the program, but he had tutors through Cascade Christian. Serven first learned during Gordon's testimony that KG-S was doing remote learning without a teacher available in real time.

Gordon conceded that she was voluntarily underemployed, and the court asked what figure it should use for her income for determining child support obligations because her income had decreased over the past few years. Gordon's counsel requested an imputed income based on data from the United States Census Bureau. *See* RCW 26.19.071(6)(a)(vi).

Gordon also presented expert testimony by Steven Kessler to help determine Serven's monthly income. Serven is engaged in land development and home building and owns many businesses. According to Kessler's written analysis, Serven had an estimated annual cash flow of $2,144,000 from all of his businesses. After tax deductions, Kessler determined that Serven had

---

[3] Respiratory syncytial virus (RSV) is a serious respiratory illness.

an annual cash flow of $802,000, or $66,898 per month.[4] Kessler also testified that keeping cash in a development company "is a prudent business decision" because it allows the business owner to take advantage of opportunities as they come up and because costs may accumulate on a project, so the business could go bankrupt if it does not have enough cash on hand. 2 RP (Jan. 20, 2021) at 158. In addition, developers are sometimes required to retain liquidity by their lenders.

Although Serven disagreed with Kessler's calculations for his income, he agreed with Kessler's testimony regarding liquidity requirements, taking advantage of acquisition opportunities, and "the need for liquidity to survive." 4 RP (Jan 25, 2021) at 518. Serven stated that his primary source of income is Oakridge Homes, which gives him a salary of $20,000 per month. He explained that, although he travels regularly for work, he is able to organize his schedule however he wants when he is in Washington. Serven's primary residence is in Gig Harbor. At the time of trial, KG-S had not yet met either of Serven's adult sons or his grandchildren, aged two and five.

The period of time that Serven claimed he was not able to see KG-S as much as he would like, and that Gordon insisted on being present for Serven's visits with KG-S, was generally when the parties did not have a temporary or permanent parenting plan establishing a schedule. Serven testified that he brought a motion to establish a parenting plan because he was concerned that it was unhealthy for Gordon to always be present when Serven spent time with KG-S.

---

[4] Kessler also testified that, at a tax rate of 35%, Serven's net monthly income would be $115,000.

After an issue on the first day of trial when Serven attempted to have time with KG-S and it did not occur, the court informed Serven that he may have KG-S stay with him from 5:30 p.m. that Friday until 5:00 p.m. on Sunday. This was the first time KG-S stayed with Serven overnight.

### III. FINAL ORDERS

The trial court entered a final parenting plan providing for joint decision-making and a shared residential schedule with alternating weeks between Gordon and Serven.

In its oral ruling, the court explained that "where the limitations of [RCW 26.09.191] are not dispositive of the child's residential schedule, the Court has to consider the following factors [under RCW 26.09.187], and the Court did." 5 RP (Feb. 9, 2021) at 563. The court then discussed each factor under the relevant statute and the evidence and testimony that supported its findings.

The trial court's written findings regarding the parenting plan are as follows:

9.1     The court determined, in reviewing the factors set forth in RCW 26.09.187(3), that Mr. Serven's testimony relating to parenting of [KG-S] was credible. Along those same lines, the testimony of Ms. Gordon, at times, was not credible.

9.2.    Mr. Serven attempted to exercise residential time with [KG-S] from shortly after his birth until the time of trial, but Ms. Gordon consistently put-up roadblocks to his exercise of residential time to the detriment of [KG-S].

9.3     Ms. Gordon unnecessarily withheld [KG-S] from Mr. Serven. Ms. Gordon withheld [KG-S] from residential time with Mr. Serven during trial due to her inconvenience. Ms. Gordon's actions in denying Mr. Serven residential time with [KG-S] were detrimental and harmful to [KG-S].

9.4     Mr. Serven is an involved, caring, and loving father. Mr. Serven did not abandon his parenting responsibilities and there is no basis to impose RCW 26.09.191 limitations on his residential time.

7

9.5     [KG-S] has a strong nurturing bond with both parents.

9.6     From time-to-time petitioner and respondent arrived at short-term agreements for the care of [KG-S], but those favored petitioner and were not in [KG-S'] best interests.

9.7     Mr. Serven has the ability to perform all necessary parenting functions for [KG-S]. He successfully raised two sons with his first wife.

9.8     Ms. Gordon's ability to perform parenting functions for [KG-S] is poor. In the past she unnecessarily withheld [KG-S] from Mr. Serven. She had no satisfactory explanation for her son by prior relationship moving from her primary care to the primary care of his father.[5] She also made poor decisions about [KG-S'] schooling by withdrawing him from in person schooling and enrolling him in an online school without any li[v]e teacher or live instruction from the school and without notice to Mr. Serven as well as arranging for two private tutors for [KG-S] although there is no evidence of a need for extra academic assistance in Kindergarten.

9.9     Mr. Serven's sons have chosen not to meet or engage with [KG-S].

9.10    [KG-S] has no physical, mental or emotional deficiencies and has no special needs. [KG-S] is doing well and there are no emotional or developmental concerns about his development to date. [KG-S] has met his developmental milestones.

9.11    Neither Ms. Gordon nor Mr. Serven have work schedules that impede or impair his or her ability to parent [KG-S]. Mr. Serven operates his own business and has employees who perform day-to-day management and Ms. Gordon is a real estate agent who can control her schedule.

9.12    It is in [KG-S'] best interests to have Ms. Gordon and Mr. Serven have a shared parenting plan.

Clerk's Papers (CP) at 551-52.

In addition, the trial court's child support order provided for Serven to make monthly payments to Gordon in the amount of $3,500.

---

[5] In its oral ruling, the trial court indicated that "[n]ormally, past parenting does not come into play in a custody decision, but this factor specifically asks this court to determine each parent's past performance of parenting functions and is not limited to the child at issue." 5 RP (Feb. 9, 2021) at 566.

In its oral ruling, the court explained why it did not agree with Gordon's request for imputed income from the United States Census Bureau: "this court has reliable income data for her . . . . For 2017, the last year she appeared to be working full time, her earnings were $6,650 per month. That is the amount the Court is imputing income to Ms. Gordon." 5 RP (Feb. 9, 2021) at 574. The court's written findings reflected this figure, which was based on Gordon's 2017 tax return.

The trial court's written findings regarding the child support order are as follows:

10.1   Ms. Gordon is voluntarily underemployed and is capable of supporting herself, her daughter, and [KG-S]. Ms. Gordon's 2017 income of $6,650 per month (gross) reflects full time earnings at her historical rate of pay based upon reliable information such as Employment Security Department data.

10.2   Ms. Gordon's standard of living is middle class. Her income is approximately the same as the median household income in the State of Washington according to census data.

10.3   Ms. Gordon has no daycare expense. Her most significant expense is her daughter's private school tuition of which she pays a portion. Ms. Gordon and her family do not take regular vacations. Ms. Gordon and her family do not participate in expensive leisure time activities.

10.4   Mr. Serven's companies are flow-through entities that require income to pass from his company to his personal tax return.

10.5   Although Mr. Serven must report all income earned by his companies, his companies must retain liquidity by holding money in accounts to satisfy lenders and to fund future projects. Therefore, he cannot distribute or spend all of the income his companies earn.

10.6   Mr. Serven's income presented at trial by Ms. Gordon reflects a three-year snapshot of his income that fluctuates and is likely to fluctuate in the future given different economic circumstances for real estate. Mr. Serven's disposable monthly net income is his net cash flow of $66,898 per month.[6]

10.7   Ms. Gordon requested $10,000 per month in child support. She presented no evidence that [KG-S'] medical, educational or financial needs would not be met or that [KG-S] would have to give up an activity or other amenity in the absence of her requested child support of $10,000 per month.

---

[6] In its oral ruling, the trial court described Kessler's written analysis as "the best evidence the Court had regarding [Serven's] income." 5 RP (Feb. 9, 2021) at 575.

10.8     Since [KG-S'] birth, Mr. Serven has been paying Ms. Gordon between $2,500.00 to $3,500.00 per month for child support for [KG-S]. Mr. Serven has wealth. Mr. Serven pays for [KG-S'] medical insurance and pays for [KG-S'] private schooling.

10.9     [KG-S] has no special medical, educational, or financial needs.

10.10     There is a significant difference in the parents' standard of living supporting an upward deviation to $3,500.00 per month. Child support of more than $3,500 for [KG-S] would provide funds beyond [KG-S'] needs and would result in raising the standard of living of Ms. Gordon's whole family.

10.11     Through January 2021, Mr. Serven owes no child support and he has not overpaid child support.

CP at 552-53.

Gordon sought almost $80,000 in attorney fees after trial: $59,269 for her trial attorney, and $18,850.89 for one of her previous attorneys. Of these fees, the trial court awarded $16,500. The trial court provided no written findings regarding this award.

IV. SERVEN'S MOTION REGARDING KG-S' SCHOOLING

The final parenting plan, providing for joint decision-making, contained a provision stating:

*With respect to the 2021/22 school year, the parents will attempt to come to an agreement between themselves on whether the child will attend private or public school. Should the parents reach an impasse, either parent may bring a motion before the trial court regarding this issue prior to the 2021/22 school year commencing.

CP at 526 (boldface omitted). When the parties could not come to an agreement, Serven filed a motion with the court. The motion, which requested that KG-S be placed at a public school in Gig Harbor, was denied, but the court ruled that KG-S was to attend a public elementary school in Puyallup, near Gordon's home.

At the time Gordon made her attorney fee request following the motion, her attorney had billed $10,340 and anticipated another two and a half hours to complete her work. Accordingly, the attorney requested $11,465 for responding to Serven's motion. The court ordered "that [Gordon's] request for attorney's fees is granted based upon RCW 26.09.140" in the amount of $1,000. CP at 952.

### V. APPEAL

Gordon now appeals, arguing that the trial court abused its discretion when it ordered joint decision-making authority, a shared residential schedule with alternating weeks, and the $3,500 per month child support payment. In addition, Gordon challenges the trial court's order regarding KG-S' schooling on the basis that it relied on an erroneous allocation of decision-making authority. Lastly, Gordon challenges two of the trial court's orders awarding some, but not all, of her attorney fees.

### DISCUSSION

### I. PARENTING PLAN

Gordon asks this court to vacate the parenting plan because, she argues, the trial court erred by allocating joint decision-making authority and a 50/50 residential schedule. We agree.

A. LEGAL PRINCIPLES

A trial court exercises broad discretion when it develops a parenting plan. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012). RCW 26.09.187 provides factors for the trial court to consider when determining the parents' decision-making authority and the child's residential schedule. RCW 26.09.187(2), (3). The court must allocate these parental responsibilities in the best interests of the child. RCW 26.09.002.

We review a parenting plan for abuse of discretion, "which 'occurs when a decision is manifestly unreasonable or based on untenable grounds or untenable reasons.' " *In re Marriage of Chandola*, 180 Wn.2d 632, 642, 327 P.3d 644 (2014) (quoting *Katare*, 175 Wn.2d at 35). We review challenged findings for substantial evidence. *In re Marriage of Black*, 188 Wn.2d 114, 127, 392 P.3d 1041 (2017). Evidence is substantial when it is sufficient to persuade a fair-minded person of the asserted premise. *Black*, 188 Wn.2d at 127. On appeal, this court does not reweigh the evidence or review the trial court's credibility determinations. *Black*, 188 Wn.2d at 127.

B. ANALYSIS

*1. Joint Decision-Making*

Gordon argues that the trial court did not consider the appropriate statutory factors in ruling that the parties have joint decision-making authority, and that the evidence did not support this ruling. Serven argues that the trial court properly ruled that the parties have joint decision-making authority based on findings related to the statutory factors. We hold that the trial court abused its discretion in allocating joint decision-making authority.

The trial court is to order sole decision-making to one parent when "[o]ne parent is opposed to mutual decision making, and such opposition is reasonable based on" the criteria provided in RCW 26.09.187(2)(c). RCW 26.09.187(2)(b)(iii). These criteria include:

(i) The existence of a limitation under RCW 26.09.191;[7]

---

[7] RCW 26.09.191 provides that the parenting plan shall not require joint decision-making, and that a parent's residential time with the child shall be limited, if the parent has engaged in willful abandonment; physical, sexual, or emotional abuse of a child; a history of domestic violence; or an assault or sexual assault. RCW 26.09.191(1)-(2)(a). The statute provides for further limitations on a parent's residential time. RCW 26.09.191(2)(a)-(b).

(ii) The history of participation of each parent in decision making in each of the areas in RCW 26.09.184(5)(a);[8]
(iii) Whether the parents have a demonstrated ability and desire to cooperate with one another in decision making in each of the areas in RCW 26.09.184(5)(a); and
(iv) The parents' geographic proximity to one another, to the extent that it affects their ability to make timely mutual decisions.

RCW 26.09.187(2)(c).

As an initial matter, Gordon contends that the trial court's failure to make findings on these statutory factors itself was an abuse of discretion. A review of the record does not show that the trial court made findings on these factors. But when evidence of the statutory factors " 'is before the court and its oral opinion and written findings reflect consideration of the statutory elements, specific findings are not required on each factor.' " *In re Parenting & Support of C.T.*, 193 Wn. App. 427, 443, 378 P.3d 183 (2016) (quoting *In re Marriage of Murray*, 28 Wn. App. 187, 189, 622 P.2d 1288 (1981)) (discussing statutory factors under RCW 26.09.187 as it relates to a residential schedule).

Gordon argues that the evidence did not support the trial court's ruling because the parties had no demonstrated ability and desire to cooperate in decision-making and Serven had no history of making decisions for KG-S.

The trial court made specific findings for each relevant factor to determine a residential schedule. Some of the court's findings on these factors could also go to the criteria for the court to consider regarding decision-making. For example, the trial court found that there was no reason to limit a parent's decision-making or residential time under RCW 26.09.191, and the court indicated that it may consider the parties' geographic proximity in relation to the residential

---

[8] These areas include the child's education, health care, and religious upbringing. RCW 26.09.184(5)(a).

schedule. But the court simply stated that it may consider the parties' geographic proximity; it did not actually discuss the geographic proximity of the parties.

In addition, the court made a finding that the parties had previously come to short-term agreements regarding KG-S' care. However, RCW 26.09.187(2)(c)(iii) requires consideration of the parents' ability and desire to cooperate *in decisions regarding the child's education, healthcare, and religious upbringing*. RCW 26.09.184(5)(a). There was evidence that the parties came to informal agreements regarding payments from Serven to Gordon and Serven's ability to visit KG-S. In addition, Serven paid KG-S' tuition at Cascade Christian and had KG-S on his health insurance after a temporary order required him to do so. But there was no evidence that the parties worked together to make decisions on KG-S' education, healthcare, and religious upbringing—in fact, as evidenced by the court's parenting plan, the parties could not reach a decision on where KG-S would attend school for the 2021-22 school year.

The trial court also found that Gordon "made poor decisions about [KG-S'] schooling" by placing him in an online private school with no interaction with a live teacher, without notice to Serven, and by hiring two private tutors when there is no evidence that KG-S needed academic assistance. CP at 552. Aside from the inconsistency of suggesting that Gordon placed KG-S in inadequate schooling, but also finding that KG-S did not need extra help with schooling (and penalizing Gordon for engaging a tutor), this finding only relates to Gordon's history of decision-making. RCW 26.09.187(2)(c)(ii) requires the court to consider each parent's history of decision-making. The trial court appeared to reason that Serven did not have any history of being able to parent KG-S because Gordon limited Serven's ability to do so. However, the trial court's findings, in its written or oral ruling, do not "reflect consideration of the statutory elements."

*C.T.*, 193 Wn. App. at 443. Therefore, the trial court abused its discretion because its decision as to the allocation of decision-making in the parenting plan was made on untenable grounds. *C.T.*, 193 Wn. App. at 444 (finding an abuse of discretion when record did not reflect consideration of statutory factors regarding residential schedule).

### 2. Order Regarding KG-S' Schooling

Gordon argues that the trial court's order requiring KG-S to attend public school in Puyallup should be reversed because it "was predicated on an erroneous allocation of decision-making authority to Serven." Br. of Appellant at 43. Serven's brief does not address this argument. Because we agree with Gordon that the trial court improperly ordered joint decision making in the parenting plan, we likewise agree with Gordon that the order on schooling should be reversed.

### 3. 50/50 Residential Schedule

Gordon argues that the trial court abused its discretion in ordering a 50/50 residential schedule, challenging several of the trial court's findings on the residential factors. Serven argues that the trial court considered the statutory factors and correctly concluded that the parties should have an equal residential schedule. We hold that the trial court abused its discretion in ordering a shared residential schedule with alternating weeks.

When neither parent's residential time with the child is limited as provided in RCW 26.09.191, "the court may order that a child frequently alternate his or her residence between the households of the parents for brief and substantially equal intervals of time if such provision is in the best interests of the child." RCW 26.09.187(3)(b). When determining the residential schedule, the trial court is to consider a list of factors "aimed at evaluating each parent's abilities,

the relationship of each parent to the [child], and the [child's] best interests in light of their

needs." *Black*, 188 Wn.2d at 126; *see also* RCW 26.09.187(3)(a). These factors include:

> (i) The relative strength, nature, and stability of the child's relationship with each parent;
> (ii) The agreements of the parties, provided they were entered into knowingly and voluntarily;
> (iii) Each parent's past and potential for future performance of parenting functions as defined in RCW 26.09.004(3),[9] including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child;
> (iv) The emotional needs and developmental level of the child;
> (v) The child's relationship with siblings and with other significant adults, as well as the child's involvement with his or her physical surroundings, school, or other significant activities;
> (vi) The wishes of the parents and the wishes of a child who is sufficiently mature to express reasoned and independent preferences as to his or her residential schedule; and
> (vii) Each parent's employment schedule.
> Factor (i) shall be given the greatest weight.

RCW 26.09.187(3)(a).

---

[9] The reviser's note for this provision explains that, following alphabetization of RCW 26.09.004, this citation should be to RCW 26.09.004(2). This subsection provides that the term "parenting functions" includes:

> (a) Maintaining a loving, stable, consistent, and nurturing relationship with the child;
> (b) Attending to the daily needs of the child, such as feeding, clothing, physical care and grooming, supervision, health care, and day care, and engaging in other activities which are appropriate to the developmental level of the child and that are within the social and economic circumstances of the particular family;
> (c) Attending to adequate education for the child, including remedial or other education essential to the best interests of the child;
> (d) Assisting the child in developing and maintaining appropriate interpersonal relationships;
> (e) Exercising appropriate judgment regarding the child's welfare, consistent with the child's developmental level and the family's social and economic circumstances; and
> (f) Providing for the financial support of the child.

RCW 26.09.004(2).

Here, in its oral ruling, the court explained that "where the limitations of [RCW 26.09.191] are not dispositive of the child's residential schedule, the Court has to consider the following factors, and the Court did." 5 RP (Feb. 9, 2021) at 563. The court then discussed each factor from RCW 26.09.187(3)(a) and its assessment of each factor, with the exception of number six—the wishes of a child who is sufficiently mature to express preferences. For each factor, the court discussed the relevant testimony and any credibility determinations that contributed to its assessment. "After consideration of the factors under RCW 26.09.187, Subsection 3, this court finds it is the best interest of [KG-S] and Ms. Gordon and Mr. Serven to have a shared parenting plan" with a week on/week off schedule. 5 RP (Feb. 9, 2021) at 570.

The court's assessment of these factors was reflected in its written findings. Among these findings were that KG-S "has a strong nurturing bond with both parents," which is the factor to be given the greatest weight under RCW 26.09.187(3)(a). CP at 551. Gordon contends that this particular finding was not supported by the evidence because Serven spent time with KG-S only occasionally and was not a stable presence in the child's life. The parties' testimony conflicted on this point, and the trial court found, based on its credibility determinations, that Gordon prevented Serven from exercising his residential time "from shortly after [KG-S'] birth until the time of trial" and that Gordon's actions were harmful to KG-S. CP at 551. As stated above, this court does not review the trial court's credibility assessments. *Black*, 188 Wn.2d at 127. However, the trial court's findings are, nevertheless, not supported by substantial evidence.

The period of time that Serven claimed he was not able to see KG-S as much as he would like, and that Gordon insisted on being present for Serven's visits with KG-S, was generally when the parties did not have a temporary or permanent parenting plan establishing a schedule.

17

Serven testified that he brought a motion to establish a parenting plan because he was concerned that it was unhealthy for Gordon to always be present when Serven spent time with KG-S. However, Serven did not bring a motion to establish a parenting plan until after Gordon had filed a motion. He could have asked the court to set a residential schedule at any point during the first four years of KG-S' life, but he did not, and he certainly had the resources to do so. Therefore, to the extent that the trial court relied on Gordon depriving Serven of "residential time" before any temporary or permanent parenting plan was ever established, this was untenable and an abuse of the trial court's discretion. CP at 551.

Gordon also challenges the trial court's finding that her "ability to perform parenting functions for [KG-S] is poor," including the trial court's reliance on the parties' history of raising other children prior to KG-S' birth. Br. of Appellant at 39-42. In its oral ruling, the trial court indicated that "[n]ormally, past parenting does not come into play in a custody decision, but this factor specifically asks this court to determine each parent's past performance of parenting functions and is not limited to the child at issue." 5 RP (Feb. 9, 2021) at 566. The trial court found that Gordon's ability to perform parenting functions was poor in part because "[s]he had no satisfactory explanation for her son by prior relationship moving from her primary care to the primary care of his father." CP at 552. On the other hand, the court found that Serven "has the ability to perform all necessary parenting functions for [KG-S]. He successfully raised two sons with his first wife." CP at 552.

Regardless of whether it was proper for the trial court to consider the parties' parenting of other children, the trial court's finding that Gordon "had no satisfactory explanation for her son by prior relationship moving from her primary care to the primary care of his father" was not an

appropriate consideration for the court. CP at 552. This finding presupposes that Gordon, as the mother, must explain any residential situation in which she did not retain a greater amount of residential time than the father. This demonstrates bias against Gordon on the basis of her gender.[10] It was, therefore, improper for the court to consider this in its assessment of the factors under RCW 26.09.187(3)(a). This court does not know to what extent the trial court relied on this finding in its assessment, but the fact that it relied on it at all was an abuse of the court's discretion.

Furthermore, as explained above regarding the decision-making statutory factors, the trial court appeared to sidestep the issue that Serven had not been involved in KG-S' parenting by placing blame on Gordon for not allowing Serven to parent KG-S. The fact that the trial court found that Gordon's "ability to perform parenting functions for [KG-S] is poor," even though she had almost exclusively been responsible for KG-S' parenting until the time of trial, shows that the trial court did not properly consider "[e]ach parent's past and potential for future performance of parenting functions[,] . . . including whether a parent has taken greater responsibility for performing parenting functions relating to the daily needs of the child." CP at 552; RCW 26.09.187(3)(a)(iii). There is no evidence in this record that Serven sought more visits or residential time with KG-S until the child was four years old. Because the trial court's findings and ruling do not reflect a proper consideration of the factors under RCW 26.09.187(3)(a), the trial court abused its discretion in ordering a shared residential schedule with alternating weeks. *See C.T.*, 193 Wn. App. at 444.

---

[10] Had Serven presented some evidence that Gordon was subjected to parental *restrictions* under RCW 26.09.191 in her parenting plan related to her other son, then perhaps this consideration could have been relevant. The trial court record contains no such evidence.

II. CHILD SUPPORT ORDER

Gordon argues that the trial court's determinations of the parties' respective incomes were erroneous and that the trial court incorrectly believed that child support must be calculated so as to ensure that it does not improve the standard of living in the receiving parent's household. Serven argues that the trial court's child support order does not show an abuse discretion. We hold that the trial court's imputation of income to Gordon and the final payment amount it decided for monthly child support payments were an abuse of discretion.

A. LEGAL PRINCIPLES

We review a child support order for abuse of discretion. *In re Marriage of Condie*, 15 Wn. App. 2d 449, 472, 475 P.3d 993 (2020). When calculating a child support obligation, the trial court must consider all income and resources in each parent's household. RCW 26.19.071(1). A parent's monthly income "shall include income from any source." RCW 26.19.071(3).

The trial court must impute income to a parent who is "voluntarily unemployed or voluntarily underemployed." RCW 26.19.071(6). The determination of whether a parent is voluntarily underemployed is based on factors such as the parent's "assets, residence, employment and earnings history, job skills, educational attainment, literacy, health, age, criminal record, dependency court obligations, and other employment barriers, record of seeking work, the local job market, the availability of employers willing to hire the parent, the prevailing earnings level in the local community," or any other factors that the court deems relevant. RCW 26.19.071(6).

Generally, parents' child support obligations are calculated using an economic table found in RCW 26.19.020. *In re Marriage of McCausland*, 159 Wn.2d 607, 616, 152 P.3d 1013 (2007). However, the table reaches a maximum net monthly income of $12,000. RCW 26.19.020. "When combined monthly net income exceeds twelve thousand dollars, the court may exceed the presumptive amount of support set for combined monthly net incomes of twelve thousand dollars upon written findings of fact." RCW 26.19.020.

B. ANALYSIS

1. *Serven's Income*

Gordon first argues that the trial court erred in finding that Serven's monthly income was $66,898 for purposes of calculating Serven's child support obligations. Gordon argues that this was error because the net business earnings appearing on Serven's personal tax returns, but left in his business accounts as retained earnings, should not have been excluded from his income.

Where a business has a sole owner, the business's earnings are considered the owner's income " 'absent a legitimate business need to retain the earnings.' " *Palomarez v. Wilcox*, 15 Wn. App. 2d 187, 192, 475 P.3d 512 (2020) (quoting *In re Marriage of Stenshoel*, 72 Wn. App. 800, 806, 866 P.2d 635 (1993)). Gordon contends that the court in *Stenshoel* did not specify "when such a showing would figure into a trial court's determination of child-support obligations," and she argues that this may bear on a request for deviation, but not on the calculation of income. Br. of Appellant at 47. However, the court in *Stenshoel* specified that the business owner bears the burden of showing that the retained earnings are necessary for the business because this allows the court "to better ensure that the amount of child support remains commensurate with [the business owner's] actual income and resources." *Stenshoel*, 72 Wn.

21

App. at 807; *see also Palomarez*, 15 Wn. App. 2d at 192 ("Washington applies the rule that 'a business's retained earnings should be considered income to the business's sole owner, absent a legitimate business need to retain the earnings.' " (quoting *Stenshoel*, 72 Wn. App. at 806)).

Gordon nevertheless argues that Serven did not show that the retained earnings from his businesses were kept for a legitimate business need. The trial court made a finding that "[a]lthough Mr. Serven must report all income earned by his companies, his companies must retain liquidity by holding money in accounts to satisfy lenders and to fund future projects. Therefore, he cannot distribute or spend all of the income his companies earn." CP at 553. This finding was supported both by Kessler's testimony and Serven's response to the court's questioning. Therefore, it was not error for the trial court to calculate Serven's monthly income without incorporating the retained earnings of his businesses.[11] "The trial court need[s] to identify the business benefit of the retained earnings before excluding that income from its consideration." *Palomarez*, 15 Wn. App. 2d at 193. The trial court did so here, and its findings and evidence support its calculation for Serven's income.

*2. Gordon's Income*

Gordon next argues that the trial court erred in imputing income to her in the amount of $6,650 in gross monthly income, which reflected her 2017 earnings.

---

[11] Gordon argues, in passing, that "the best number to use" to represent Serven's monthly income was $115,000, which Kessler testified would be his net cash flow at a lower tax rate. Br. of Appellant at 50. Kessler's testimony supported both this figure and the $66,898 figure, as pointed out by the court. But Kessler's written analysis in Exhibit 128 indicated that $66,898 was Serven's net monthly cash flow. The trial court described this exhibit as "the best evidence the Court had regarding [Serven's] income." 5 RP (Feb. 9, 2021) at 575. Gordon provides no argument as to why the trial court abused its discretion by relying on this figure.

RCW 26.19.071(6)(a) provides guidelines for imputing income "in the absence of records of a parent's actual earnings," listed in order of priority. At the top of this list is "[f]ull-time earnings at the current rate of pay," followed by "[f]ull-time earnings at the historical rate of pay based on reliable information, such as employment security department data." RCW 26.19.071(6)(a)(i) and (ii).

The trial court imputed income to Gordon in the amount of $6,650 per month, her 2017 earnings, because that was "the last year she appeared to be working full time." 5 RP (Feb. 9, 2021) at 574. But the record reflects that Gordon's income had decreased in more recent years due to a combination of lack of child care, fluctuating ability to earn money in the real estate market, issues related to the COVID-19 pandemic, and Gordon needing to oversee KG-S' remote learning during the 2020-21 school year. Notably, the trial court found that Serven's income "is likely to fluctuate . . . given different economic circumstances for real estate." CP at 553. But it made no such finding for Gordon's income, despite the fact that she works as a real estate agent. And the trial court apparently also did not consider how COVID-19 would have affected Gordon's earnings. Rather, the trial court chose the highest income from the figures submitted by Gordon and imputed income in that amount. This amount was not supported by substantial evidence, and it was an abuse of the court's discretion to impute income in the amount of $6,650.

*3. Serven's Child Support Obligation*

Gordon also argues that the trial court erred in the amount of child support it calculated due to its misconception that an upward deviation must be calculated so as not to improve the standard of living in Gordon's household. Serven argues that the disparity in the parties'

incomes, alone, does not justify ordering more child support. We hold that the trial court abused its discretion in setting child support payments at $3,500 per month.

Child support orders are intended to ensure both that the child's basic needs are met "and to provide additional child support commensurate with the parents' income, resources, and standard of living." RCW 26.19.001. A trial court's findings regarding an upward deviation from the standard economic table should include consideration of the necessity and reasonableness of the support. *In re Marriage of Daubert & Johnson*, 124 Wn. App. 483, 495-96, 99 P.3d 401 (2004), *abrogated on other grounds by McCausland*, 159 Wn.2d at 619; *see also McCausland*, 159 Wn.2d at 620. Necessity includes factors such as special medical, educational, and financial needs, and reasonableness may be determined by considering "the parents' income, resources[,] and standard of living." *Daubert & Johnson*, 124 Wn. App. at 496.

Here, the trial court found that KG-S "has no special medical, educational, or financial needs." CP at 553. And, although it found that "[t]here is a significant difference in the parents' standard of living," the trial court found that this disparity only supported an upward deviation to $3,500 per month because any amount over that "would provide funds beyond [KG-S'] needs and would result in raising the standard of living of Ms. Gordon's whole family." CP at 553. Serven argues that this was proper based on language in *Daubert & Johnson*.

Although the *Daubert* court did state that "[t]he mere ability of either or both of the parents to pay more . . . is not enough to justify ordering more support," the court explained that the test for ordering an upward deviation is "the necessity for and *reasonableness* of the amount considering the totality of the circumstances." *Daubert & Johnson*, 124 Wn. App. at 498 (emphasis added). As stated above, the reasonableness is based on both parents' income and

standard of living. *Daubert & Johnson*, 124 Wn. App. at 496. Therefore, when one parent has a dramatically higher standard of living than the other parent, it is appropriate for the court to order a higher amount of child support. *In re Marriage of Scanlon & Witrak*, 109 Wn. App. 167, 179, 34 P.3d 877 (2001); *see also In re Marriage of Krieger and Walker*, 147 Wn. App. 952, 967, 199 P.3d 450 (2008) (remanding to trial court to recalculate child support "to ensure that it maintains the children's standard of living at a level commensurate with that of both parents and is equitably apportioned between them.").

The trial court erred when it set the child support amount lower than what was reasonable because it did not want to raise the standard of living in Gordon's home. KG-S is entitled to a higher standard of living based on both parents' incomes, and Serven's net monthly income is almost 20 times the amount of support that the court set. We reverse the child support order because the $3,500 obligation it ordered Serven to pay each month was not reasonable given the totality of the circumstances. *See Daubert & Johnson*, 124 Wn. App. at 498.

### III. ASSIGNMENT ON REMAND

Gordon requests that this court reassign this matter to a different judge on remand. This court may reassign a case before a different judge on remand where " 'the trial judge will exercise discretion on remand regarding the very issue that triggered the appeal and has already been exposed to prohibited information, expressed an opinion as to the merits, or otherwise prejudged the issue.' " *Black*, 188 Wn.2d at 137 (quoting *State v. McEnroe*, 181 Wn.2d 375, 387, 333 P.3d 402 (2014) (footnotes omitted)). Because the trial judge has already addressed the issues that triggered this appeal, reassignment of this matter to a different judge on remand is appropriate. *See Black*, 188 Wn.2d at 137.

IV. Award of Attorney Fees at Trial Court

Gordon argues that the trial court abused its discretion in awarding only a portion of Gordon's requested attorney fees with no reasoning for its calculations. Serven argues that Gordon was not entitled to attorney fees and that it was not an abuse of discretion for the trial court to award only a portion of the fees Gordon requested. We agree with Gordon.

A. Legal Principles

Under RCW 26.09.140, a trial court may order one party to pay reasonable attorney fees or other professional fees in proceedings governed by chapter 26.09 RCW "after considering the financial resources of both parties." A trial court's decision to award fees under RCW 26.09.140 is discretionary, and the trial court must balance the financial need of the requesting party against the other party's ability to pay. *In re Marriage of Urbana*, 147 Wn. App. 1, 16, 195 P.3d 959 (2008). "A lack of findings as to either need or ability to pay requires reversal." *Scanlon*, 109 Wn. App. at 181. This court reviews the decision to award or deny attorney fees, and the reasonableness of the award, for an abuse of discretion. *Gander v. Yeager*, 167 Wn. App. 638, 647, 282 P.3d 1100 (2012).

B. Analysis

Here, the trial court awarded Gordon some attorney fees in both orders at issue, but not all of the fees she requested. After trial, the fees she sought totaled almost $80,000, and the trial court awarded $16,500 with no explanation. In addition, Gordon requested attorney fees of $11,465 in connection with Serven's motion relating to KG-S' schooling. The trial court "granted [Gordon's request] based upon RCW 26.09.140," awarding $1,000. CP at 952.

"[T]here is no indication in the record of how the court reached the [ ] figure[s]" that it awarded. *In re Marriage of Sanborn*, 55 Wn. App. 124, 130, 777 P.2d 4 (1989). The trial court made no findings regarding need or ability to pay, and no findings regarding the reasonableness of the amount. Furthermore, given the wide financial disparity between the parties, the award of fees to Gordon was "patently unreasonable." *Sanborn*, 55 Wn. App. at 130. Accordingly, we vacate the attorney fee awards and remand for the trial court to reconsider the attorney fee award. *Sanborn*, 55 Wn. App. at 130.

## V. ATTORNEY FEES ON APPEAL

Gordon requests attorney fees on appeal under RAP 18.1 and RCW 26.09.140.

Under RAP 18.1(a), a party may request attorney fees on appeal if "applicable law" grants them the right to recover the fees. RCW 26.09.140 grants this court discretion to award attorney fees on appeal in proceedings governed by chapter 26.09 RCW. An award under RCW 26.09.140 is based on a consideration of " 'the parties' relative ability to pay' and 'the arguable merit of the issues raised on appeal.' " *In re Marriage of Muhammad*, 153 Wn.2d 795, 807, 108 P.3d 779 (2005) (quoting *In re Marriage of Leslie*, 90 Wn. App. 796, 807, 954 P.2d 330 (1998)).

RAP 18.1(c) requires each party to file a financial affidavit if the financial resources of the parties are to be considered by the court. Serven did not file such an affidavit, and Gordon filed a motion to compel him to do so. Serven objected to the motion and, in so doing, conceded that he "has accepted [the] risk" that we may award attorney fees to Gordon based only on her showing of need and the fact that he has not submitted an affidavit. Response to Motion to Compel at 3. We may grant a party's fee request in the absence of a financial affidavit from the opposing party challenging his or her ability to pay. *See In re Marriage of Mansour*, 126 Wn.

App. 1, 17, 106 P.3d 768 (2004); *In re Marriage of Fox*, 58 Wn. App. 935, 940, 795 P.2d 1170 (1990); *Sanborn*, 55 Wn. App. at 131. Accordingly, we deny Gordon's motion to compel and presume that Serven has the ability to pay.

Gordon's affidavit shows that she has financial need, and she has prevailed on most of the issues she argues on appeal. Accordingly, we grant Gordon's request for attorney fees on appeal for this issue in an amount to be determined by the court commissioner.

CONCLUSION

The parenting plan, child support order, and orders awarding attorney fees are reversed. We remand for proceedings consistent with this opinion. On remand, the proceedings shall be held before a different trial judge.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Cruser, J.

We concur:

Glasgow, C.J.

Veljacic, J.